*In re: Adoption/Guardianship of C.E.*, No. 77, September Term 2017.  Opinion by Getty, J.

**FAMILY LAW— TERMINATION OF PARENTAL RIGHTS—FAMILY LAW ARTICLE § 5-323—UNFITNESS**

A juvenile court abuses its discretion when it declines to find the parents unfit and terminate parental rights even though it has found that the parents are unable to ever safely care for their child.

**FAMILY LAW—TERMINATION OF PARENTAL RIGHTS—FAMILY LAW ARTICLE § 5-323—EXCEPTIONAL CIRCUMSTANCES**

A juvenile court abuses its discretion when it declines to find exceptional circumstances and terminate parental rights when the father refuses to sever his relationship with the child's mother who is unfit to safely care for the child.  The mother had a lengthy history of serious mental illness that neither parent acknowledged, and the father sought to move-in with the mother and frequently leave the child, alone in the mother's care.

**FAMILY LAW—TERMINATION OF PARENTAL RIGHTS—SUBSEQUENT ACTION**

A juvenile court errs as a matter of law when it changes a child in need of assistance permanency plan during a termination of parental rights hearing conducted pursuant to Maryland Code, Family Law Article, § 5-323 without issuing two separate orders pursuant to Maryland Code, Family Law Article, § 5-324.  Such error is not harmless when the juvenile court's order applied the preponderance of the evidence standard to the underlying termination of parental rights hearing.

Circuit Court for Baltimore City
Case No. T16106011
Argued: June 1, 2018
Reargued: March 1, 2019

IN THE COURT OF APPEALS
OF MARYLAND

No. 77

September Term, 2017

---

IN RE: ADOPTION/GUARDIANSHIP OF
C.E.

---

Barbera, C.J.
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D. (Senior Judge,
Specially Assigned)

JJ.

---

Opinion by Getty, J.

---

Filed: June 6, 2019

Before us is a judgment of the Circuit Court for Baltimore City declining to terminate the legal relationship between a mother, a father, and their child and ordering the child into the guardianship and custody of a relative. We are asked to consider whether allowing this child to remain indefinitely in the custody of the third party, without terminating the parental rights of the father or of the mother, constitutes a proper exercise of judicial discretion when evidence was presented at the termination of parental rights hearing that neither parent possesses the ability to ever safely care for the child. In reviewing this issue, we continue to follow this Court's precedent of more than a decade and affirm that the pursuit of the best interest of the child remains the overarching goal when considering the termination of parental rights ("TPR") pursuant to § 5-323 of the Family Law Article (hereinafter "FL") of the Maryland Code.

This Court first completed a comprehensive review of TPR proceedings in 2007, in *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477 (2007). Three years later, this Court, in *In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90 (2010), reexamined TPR proceedings and confirmed the child's best interest remains the prevailing standard as outlined in *Rashawn H.* Following *Rashawn H.* and *Ta'Niya C.*, this Court specifically reviewed the unfitness prong of FL §5-323, in *In re Adoption/Guardianship of Amber R.*, 417 Md. 701 (2011) and the exceptional circumstances prong of FL § 5-323, in *In re Adoption/Guardianship of H.W.*, 460 Md. 201 (2018).

Now, we seek to further clarify the circumstances under which a juvenile court must find that termination of parental rights is the proper recourse under either the unfitness

prong or the exceptional circumstances prong of FL § 5-323.[1]  We hold that in order to

achieve the best interest of the child and to provide sufficient permanency for the child, it

was an abuse of discretion for a juvenile court to decline to terminate the parental rights of

the Father when a juvenile court finds that Father can never safely care for the child.

Sufficient permanency for the child is not achieved when the child remains indefinitely in

the guardianship and custody of a relative.  Furthermore, we hold the juvenile court abused

its discretion when it failed to recognize an exceptional circumstance justifying the

termination of the parents' parental rights.  Finally, it was an error of law for the juvenile

court to change a child in need of assistance (hereinafter "CINA") permanency plan during

a termination of parental rights hearing conducted pursuant to FL § 5-323 without issuing

two separate orders pursuant to FL § 5-324.  Accordingly, we shall vacate the judgment of

the juvenile court and remand this matter for further proceedings consistent with this

opinion.

## BACKGROUND

C.E. (hereinafter "C.E." or "the child") is a male child born in May 2014 to C.D.

(hereinafter "Mother")[2] and H.E. (hereinafter "Father").  C.E. was born two months

---

[1] While pending in the Court of Special Appeals, C.E. filed a timely Petition for Writ of Certiorari before this Court in an effort to expedite permanency for C.E.  We granted certiorari on February 5, 2018.

[2] Mother does not appeal the juvenile court's conclusion that there was clear and convincing evidence presented to support termination of her parental rights.  However, Mother has participated in the appeal, arguing along with Father, that the juvenile court's findings, declining to terminate both of their parental rights due to Father and C.E.'s relationship, should be affirmed.  The following background involving the Mother is

premature and after birth was placed in the Neonatal Intensive Care Unit of Johns Hopkins Hospital. In time, he was transferred to the Mount Washington Pediatric Hospital.

Immediately after C.E.'s birth, a Baltimore City Department of Social Services (hereinafter "the Department") caseworker, Nia Noakes, responded to a "risk of harm" report and a request for a safety assessment of a newborn by Johns Hopkins Hospital. As a part of the safety assessment, Ms. Noakes examined Mother's home with both parents present. Ms. Noakes also consulted the Department's records to determine whether the family had a history with the Department.

Ms. Noakes discovered that the Department had removed Mother's other five children from her care over the past two decades. *See In re C.E.*, 456 Md. 209, 211 (2017). Mother first interacted with the Department in 1996.[3] *Id.* C.E. was Mother's sixth child to be adjudged CINA.[4] *Id.* Mother has a well-documented history of mental illness causing her to lash out against her children. *Id.* Her "previous mental health diagnoses include paranoia, adjustment disorder, major depression, somatization disorder, borderline

---

included in this opinion to the extent that it is relevant to the findings of the Father, whose relationship to the child is at issue.

[3] The Court of Special Appeals has set forth these extensive interactions in at least five decisions. *See In re Joy D.*, 216 Md. App. 58 (2014); *In re C.E.*, No. 925, Sept. Term, 2015, 2015 WL 9183397 (Md. Ct. Spec. App. Dec. 15, 2015), *cert. denied* 446 Md. 705 (2016); *In re Adoption/Guardianship of Joy D.*, No. 2307, Sept. Term, 2014, 2015 WL 5821580 (Md. Ct. Spec. App. Aug. 13, 2015), *cert. denied*, 445 Md. 20 (2015); *In re Joy D.*, No. 1894, Sept. Term, 2013 (Md. Ct. Spec. App. May 2, 2014); *In re Adoption/Guardianship of Malachi D.*, No. 3006, Sept. Term, 2010, (Md. Ct. Spec. App. Sept. 20, 2011), *cert. denied*, 424 Md. 56 (2011).

[4] The first CINA finding occurred in 1998 and the latest CINA finding, pertaining to C.E., took place in 2015.

3

personality disorder, mania, and bipolar affective disorder." *Id.* Mother has also demonstrated "fits of rage." *Id.* On numerous occasions, "juvenile courts repeatedly have found that [Mother] displayed a complete inability to care for her children, control her emotions, or effectively communicate with her children and the Department." *Id.* at 212.

After the home visit and subsequent research, Ms. Noakes held a Family Involvement Meeting ("FIM")[5] to determine whether C.E. could be safely placed with either Mother or Father. Concerned with Mother's previous interactions with the Department, Ms. Noakes determined that C.E. would not be safe in her care. The Department also learned that Father could not care for C.E. because Father resided in a senior housing complex that did not allow children to reside at the property except for a short-term duration of two weeks.

The Department filed for emergency shelter care on July 10, 2014, in the Circuit Court for Baltimore City (hereinafter "juvenile court")[6] while C.E. was still at Mount Washington Pediatric Hospital. In late June or early July 2014, Mother telephoned her cousin, Ms. B., and advised that she could not take C.E. home from the hospital and asked for permission to provide Ms. B.'s contact information to Mount Washington Pediatric

---

[5] A FIM is a casework practice with the purpose of establishing "a team to engage families and their support network to assess the needs and develop service plans. The goal is to develop service plan recommendations for the safest and least restrictive placement for a child while also considering appropriate permanency and well-being options for that child."

[6] The judge of the Circuit Court for Baltimore City was sitting as the juvenile court throughout this proceeding. *See* Md. Code (2006, 2013 Repl. Vol.), Courts & Judicial Proceedings, § 3-801(i).

Hospital and the Department. Mother and Ms. B. had not been in contact for years prior to C.E.'s birth and had only reconnected when Mother found Ms. B. on Facebook. Ms. B. and her husband, Mr. B. consented. The Department reached out to Ms. B. and Mr. B. to conduct a background check and begin the placement process.

After a hearing in July 2014, the juvenile court granted the Department's request for temporary care and custody of C.E. By July 15, 2014, Mr. and Ms. B. had successfully completed the necessary department requirements. Upon C.E.'s hospital discharge on July 21, 2014, the Department placed C.E. with them where he has remained throughout his entire life.

During the summer of 2014, the Department facilitated the second FIM for both parents. Father entered into a service agreement with the Department that was in effect from July 11, 2014 to September 11, 2014, and committed to finding housing where he could reside with C.E. The Department also referred Father to the Center for Urban Families'[7] parenting classes which occurred twice a week for three months. Father initially did not attend the classes but he eventually completed the weekly ten-week course on positive parenting skills. Father was also referred to Hebron House[8] for anger management counseling.

---

[7] The Center for Urban Families is located at 2201 North Monroe Street, Baltimore, Maryland 21217. The organization's mission is to strengthen Baltimore communities by helping fathers and their families achieve stability.

[8] Hebron House, Inc. is a community-based outpatient mental health clinic serving the Baltimore Area since 2003.

The Department continued to provide other services to the parents to achieve reunification with C.E. The Department facilitated regular supervised visits between C.E., Mother, and Father. The visits were scheduled weekly during 2014 and bi-weekly from 2015 to 2017. Initially the visits occurred supervised at the Mother's home for three months. However, the Department decided to move the visits to Department facilities due to environmental concerns. The Department provided the supervision during the visitation period and both parents attended most of the scheduled visits. These visits were occasionally marked with C.E.'s angry outbursts towards his Mother. On other occasions, the visits were characterized as generally positive interactions with Father.

After multiple postponements, the juvenile court found C.E. to be a child in need of assistance on June 16, 2015 and awarded custody to the Department for continued placement with his relatives, Mr. and Ms. B. Additionally, the supervised visitation was continued and Father was ordered to submit to a clinical evaluation by Court Medical Services.[9] Mother appealed the juvenile court's findings to the Court of Special Appeals which affirmed the judgment of the juvenile court. *See In re C.E.*, No. 0925, Sept. Term, 2015, 2015 WL 9183397 (Md. Ct. of Sp. App., Dec. 15, 2015) ("The juvenile court's findings were supported by the evidence presented and the court's CINA determination was supported by the law. Accordingly, we hold that the trial court did not err nor abuse its discretion when it found C.E. to be CINA and committed him to the custody of the Department."), *cert. denied*, 446 Md. 705 (2016).

---

[9] On July 21, 2015, Father underwent this clinical evaluation.

6

On April 20, 2016, the juvenile court granted the Department's motion to waive its obligation to continue to make reasonable efforts to reunify Mother with C.E. pursuant to § 3-812(d) of the Courts & Judicial Proceedings Article (hereinafter "CJP") of the Maryland Code. Mother appealed. The Court of Special Appeals determined that the juvenile court's decision to waive reasonable efforts for reunification was not appealable and therefore dismissed the appeal. *In re C.E.*, No. 0464, Sept. Term, 2016, 2016 WL 7235560 (Md. Ct. Spec. App., Dec. 14, 2016), *aff'd*, 456 Md. 209 (2017). Following this Court's determination on waiver, the Department filed a Petition for Guardianship with the Right to Consent to Adoption or Long-Term Care Short of Adoption.

The termination of parents rights hearing took place in 2017 on the following dates: March 20, March 21, April 27, May 2, June 27, and July 5. First, Ms. Noakes testified as a family services case worker with the Department. She testified to her interactions with both parents immediately after C.E. was born and while the Department was determining whether to petition for shelter care and guardianship.

Next, Brenda Harriel, Coordinator of Medical Services for the Juvenile Section, testified as an expert witness in clinical and forensic social work, with specialties in diagnosis and treatment of individuals with DSM-V[10] mental health diagnosis and parenting skills assessments. She evaluated Father in July of 2015. In reaching her conclusion, she relied on her meeting with Father, court documents, and the Department's

---

[10] The DSM-V is the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

family social history report. Father refused to consent to the release any of his medical records. She determined that Father presented with schizotypal personality disorder which features "cognitive or perceptual distortions . . . odd beliefs, peculiar behaviors, inappropriate or constrictive affect, and reduced capacity for close relations." She recommended no treatment for his personality disorder. Ms. Harriel opined that Father would not be able to "provide proper care in a consistent, protective, and nurturing way."

Ms. Harriel also testified to her evaluation of Mother in 2010. That evaluation was conducted during proceedings for one of Mother's other children, J.D. During that evaluation, Mother refused to answer questions, claiming her rights were being violated. From her behavior that day, Ms. Harriel observed symptoms of mania. However, Ms. Harriel conceded that she had not evaluated Mother since 2010.

Mr. and Ms. B. testified next. They explained that C.E. is epileptic and continues to receive medication for his epilepsy as prescribed by a neurologist. C.E. also exhibits delays in physical growth and has problems with communication, executive function, and attention deficit. He has been characterized as very active, impulsive, quick to frustration, and aggressive. They stated that at the time of the hearing, he was undergoing a formal diagnostic process at Johns Hopkins Bayview Medical Center to determine whether he is on the autism spectrum. Ms. B. acknowledged C.E.'s challenges, but was satisfied with the progress he had made in their home. She testified:

> C[E.]'s a good boy . . . He get up, and eat, and do what he do. He likes to be in his room. His room is like his little castle. He likes cartoons. He likes playing the cool stuff. He plays the guitar . . . He likes to play. He likes to run and jump. [C.E.]'s [sic] very active.

8

When asked during each of their examinations whether they wished to adopt C.E., they both answered that they wished to adopt him.

Laurie Higginbotham, the Clinical Social Worker Supervisor with the Department also testified and was accepted as an expert. Ms. Higginbotham was asked to observe a visit and to give some suggestions to Father and Mother to improve visitation with C.E. After observing Father with C.E. during several visits, Ms. Higginbotham opined that Father sometimes interacted appropriately with C.E. but that caring for C.E. consistently would likely be too stressful for Father. She noted that in her opinion, the Father would have difficulty sustaining enough energy for C.E. Overall, she concluded that C.E. requires focus and attention that Mother and Father cannot provide for their child.

After Ms. Higginbotham, Ms. Mary Ann Ervin, a Supervisor for the Department, testified. Ms. Ervin was familiar with Mother due to Mother's previous interactions with the Department. Ms. Ervin explained some of the Department's efforts toward attempting reunification between the parents and C.E. Further, a variety of documents detailing the parents' interactions with the Department were admitted into evidence.

Next, Nkeiruka Udom, the assigned caseworker testified. She was assigned to the case in 2017 after taking over for another caseworker. Ms. Udom testified to some of the visits she witnessed between C.E. and his parents.

After the conclusion of Ms. Udom's testimony, Mother was called as a witness. Prior to the start of the hearing, the juvenile court had granted Mother's request to have an accommodation and participate in the hearing through the telephone. For her testimony, the juvenile court required Mother to appear by video conference so that the parties and the

juvenile court had the benefit of her demeanor during the examination. Through video conference, Mother explained her visitations with C.E. and her interactions with the Department. She believes the Department "took" C.E. only because of her prior interactions with the Department. Mother also testified that she maintains her own residence but spends a substantial amount of time with Father at his residence. She stated Father and Mother were looking to move to Delaware together. Mother also testified that she does not have a good relationship with Mr. and Ms. B.

As for her mental health, Mother stated, "I don't have a mental illness, I have PTSD from legal abuse syndrome."[11] Mother commented that she was testifying in this matter against her health. After Mother's first day of testimony, the Court characterized her responses during cross-examination as "long," "distorted," "nonresponsive" narratives to the questions asked. When cross-examination was to resume five days later, Mother did not appear. Within those five days, Mother had been hospitalized and discharged for anxiety and chest-pains. The juvenile court excused Mother from testifying that day and sought to reschedule Mother's testimony when her health permitted. Mother waived her appearance for the day.

Father testified after Mother was excused. Father and Mother began their relationship in 2010 and remain together. Father was educated through the ninth grade and is employed full-time as a dishwasher. He receives Supplementary Security Income for a

---

[11] "Legal Abuse Syndrome" is not recognized in the DSM-V. The theory is credited to authors such as Dr. Karin D. Huffer. "Legal Abuse Syndrome" is known to Mother through her review of resources such as those propounded by Dr. Huffer.

10

disability. C.E. is Father's second-born son. Father's first child, who is now an adult, entered the foster care system during minority and was raised by Father's sister. Father acknowledges he did not participate in the raising of his first son.

Since C.E.'s birth and through the termination of parental rights hearing, Father has resided in senior citizen housing. His housing prohibits children from residing at the residence for longer than two weeks. When asked whether he planned to live with Mother if C.E. was returned to him, Father responded "I would have to." He testified further that if C.E. was returned, he would exclusively rely on Mother to care for C.E. while he was at work. Father does not believe Mother has any mental illnesses and he is adamant that he will not separate C.E. from Mother. Father admitted past domestic violence with Mother, but testified that he had addressed that issue by attending classes at the Center for Urban Families. As Mother did during her direct examination, Father testified to his sincere desire to reunite with C.E.

The hearing resumed to permit C.E. to conduct cross-examination of Mother. Mother indicated she was not able to continue testifying and gave a narrative statement on the record without being sworn and without anyone's ability to cross-examine Mother.[12]

---

[12] At the end of the hearing that day, the juvenile court stated on the record that it was issuing an ordering regarding Mother's narrative. The juvenile court indicated the order would state, in part:

> Mother's admission that she is the same . . . . she is the same advocate she was in the [J.D.] and [M.D.] case is found sincere and credible and is, in my view, an admission. Her voluntary narrative statement on the record is unsworn and laced with unsupported sensational accusations against the Court, the attorneys, the parties and the Department of unconstitutional practices, racism, victimization, blame, none of which is appropriate to be

11

In order to achieve a resolution to the matter, C.E. waived his cross-examination of the Mother. The hearing concluded that day.

*The Juvenile Court's Findings*

The juvenile court denied the Department's Petition for Guardianship with the Right to Consent to Adoption or Long-Term Care Short of Adoption. The Court found that there was clear and convincing evidence that Mother was unfit but that there was only a preponderance of the evidence that Father was unfit. Because it denied the petition for guardianship, the juvenile court did not terminate either Mother's or Father's parental rights. Specifically, the juvenile court wrote, in part, in its opinion:

> [T]he Court concludes that there is not clear and convincing evidence that it is in [C.E.'s] best interest to terminate his parents' parental rights; nor is there clear and convincing evidence that it would be contrary to [C.E.'s] welfare to continue his parents' parental rights, diminished by a changed permanency plan of custody and guardianship to cousin [Ms. B.] and [Mr. B] without termination of parental rights. The Court finds in denying the TPR at this time and simultaneously changing [C.E.'s] permanency plan to [custody and guardianship] without termination of parental rights is in [C.E.'s] best interest and welfare.

> The findings below show by a preponderance of the evidence that there is no likelihood [of] reunification of [C.E.] with Mother and/or Father can be achieved in the foreseeable future, in eighteen months, or indeed, ever.

> \*\*\*

> While adoption remains the gold standard of permanency where reunification is not safely possible, in this case the very strong commitment of [Mother]'s relatives, [][Mr. and Ms. B.], to his care, convince this Court that [C.E.] will

---

received as evidence and none of which was focused on the parenting, medical, educational and nurturing needs of the Respondents or the Respondent, age 3.

12

have the benefit of stability and permanence with the plan adopted here in childhood and into his adulthood.

Father's [sic] more likely than not unfitness to parent [C.E.] results from his lack of housing where [C.E.] can live in small part []. Father's mental health evaluation [] opines a diagnosis of Schizotypal Personality Disorder. However, that diagnosis is not convincing in the fact of the consistently reported good parenting time/visitation Father has shared with [C.E.] Furthermore, the limited factual and analytical basis in this record for that diagnosis [] causes the Court to give little weight to the mental health assessment, on which [the Department] and [C.E.]'s counsel make no comment in argument. However, Father's [sic] found more than likely unfitness rests in great degree upon his admitted nearly total reliance on Mother to parent [C.E.] when he is unavailable during extensive working hours. While the provision of daycare to assist Mother is theoretically a safe plan for reunification, it is patently clear on this record that Mother's mental health would not allow her to accept this support necessary for [C.E.'s] safety in Mother's care. Repeatedly, Mother decomposes into stress induced rage behaviors whenever a third party challenges the smallest aspect of her parenting conduct; [C.E.] can not and should not be subjected to this well established pattern of psychological abuse by Mother.

While neither parent individually or together is able to care for [C.E.] the Court is convinced that [C.E.] knows his parents and displays a sufficient connection with them—particularly with Father—to raise safety concerns for the termination of that relationship which has not been overcome by any clear and convincing evidence otherwise.

Both the unfitness found for [C.E.]'s parents (by clear and convincing evidence for Mother; merely a preponderance of the evidence for Father) and the exceptional circumstances found support the change of permanency plan to custody and guardianship without termination of parental rights.

\*\*\*

[I]n the three years [C.E.'s] CINA case and more recently this TPR case have been pending, parents have achieved very little to prepare a safe placement for [C.E.] in their care. The entire record does support, by clear and convincing evidence, a finding that there is no likelihood those circumstances will change in the foreseeable future or ever. So found.

\*\*\*

13

Unfortunately, notwithstanding [the Department's] efforts and Father's relative compliance with service agreement requirements, Father's senior housing that excludes [C.E.] from living there has not changed, and has no likely prospect of changing. [C.E.] is not permitted by applicable regulations to be legally resident [sic] in Father's apartment, by clear and convincing evidence, indeed undisputed evidence, on that issue. Father is not shown by clear and convincing evidence to be an unfit parent on this record—but the Court does find it more likely than not Father is unable—unfit to parent [C.E.] Additionally, the Exceptional Circumstances of his lacking housing and Father's clear dependence on Mother for daycare while he is employed, coupled with the additional Exceptional Circumstances found below, convince this Court that it is in C.E.'s best interest for the permanency plan to be changed to custody and guardianship to [Mr. and Ms. B.] without termination of parental rights.

\*\*\*

Neither parent has contributed support for [C.E.'s] care and maintenance.

Neither parent has displayed in visitation essential safe parenting skills— including but not limited to mirroring, patience, and affirmation—that are needed by [C.E.] particularly in response to his now presenting possible autism spectrum behaviors, seizure disorder, and speech development delays.

[Mr. and Ms. B.] provide [C.E.] safe stability in their care; in sharp contrast Mother's erratic, angry, raging behaviors and stress dysregulation, and Father's absence (employment schedule) would be a profoundly unstable emotional environment for [C.E.].

Based on these findings, the juvenile court determined that it was in C.E.'s best interest to place C.E. in a guardianship with his extended family without terminating the parental rights of either parent.

After noting timely appeals to the Court of Special Appeals, C.E. and the Department filed separate petitions for writ of certiorari, which this Court granted on February 5, 2018. Together, C.E. and the Department collectively pose the following five questions before this Court:

14

1. Whether a CINA child has a protected interest in achieving a timely permanency plan of adoption that transcends his parents' right to raise him, where the three (3) year old child has resided in the same relatives' home since birth and where the trial court found, by clear and convincing evidence, that reunification is "unachievable . . . in the foreseeable future"?

2. Whether it is error of law for a court to change a CINA child's permanency plan in a [g]uardianship proceeding conducted pursuant to [FL] § 5-323?

3. Whether the court's application of its findings of exceptional circumstances to justify custody and guardianship to relatives instead of using the exceptional circumstances to support a grant of guardianship, was an error of law in contravention of the statute's clear preference for adoption over custody and guardianship?

4. Did the juvenile court err when it failed to find that Father was unfit to remain C.E.'s legal father in light of its finding, by clear and convincing evidence, that there was no likelihood that Father would ever be able to safely care for C.E.?

5. Did the juvenile court err as a matter of law in its exceptional circumstances analysis, by elevating an incidental "parental" relationship over C.E.'s best interests in achieving the permanence afforded by adoption?

This Court heard oral argument on June 1, 2018 and an opinion was issued on August 13, 2018. Our opinion affirmed the juvenile court's findings as to Father, but reversed the juvenile court's findings as to the Mother, concluding "it was error for the juvenile court to deny termination of Mother's parental rights." On August 24, 2018, the Department, C.E., and the Mother filed a Motion for Reconsideration pursuant to Maryland Rule 8-605. The Department and C.E. argued this Court could not order the termination of only one parent's parental rights. Mother also requested that this Court reconsider its

15

Opinion and affirm the judgment of the juvenile court.[13]  In a reply, the Father adopted and joined the Mother's motion.

By Order on December 3, 2018, this Court withdrew its opinion and ordered supplemental briefing and additional argument on a single issue: "Whether the parental rights of both parents must be terminated to grant guardianship under FL §§ 5-323(b) and 5-325(a)(1), [or] whether the termination of the parental rights of only one parent is required."  *In re Adoption/Guardianship of C.E.*, No. 77, Sept. Term, 2017, 2018 WL 6288264 (Md. Ct. of App.  Dec. 3, 2018).  This Court heard oral argument on that supplemental issue on March 1, 2019.

After consideration of the issue on reargument, we recognize that our current statutory scheme requires the termination of both parent's parental rights.  There are only three possible scenarios that may culminate in a guardianship pursuant to Title 5, Subtitle 3 of the Family Law Article: (1) both parents consent, (2) one parent consents, and the juvenile court terminates the parental rights of the other parent; or (3) neither parent consents, and the juvenile court terminates the rights of both parents.  When neither party consents and where a local department of social services files a petition for guardianship, a juvenile court only has two options: (1) to either grant the petition and terminate both parents' rights; or (2) to deny the petition and refrain from terminating either parents' rights.  The juvenile court's judgment is comprised only of the grant or the denial of the

---

[13] Mother also agreed with the Department and C.E. that this Court could not terminate the rights of a single parent.

petition for guardianship. Where a juvenile court denies a petition for guardianship, the juvenile court's judgment is wholly in the parents' favor—even if the juvenile court finds that one parent is unfit. Therefore, we erred in our now withdrawn opinion in which we terminated the Mother's parental rights and kept the Father's parental rights intact.

Upon reconsideration of all of the issues before us, and for the reasons stated below, we conclude that in order to achieve the best interest of C.E. and to provide sufficient permanency for him, it was an abuse of discretion for the juvenile court to decline to terminate Father's parental rights when the juvenile court determined that based on the factors present, Father was unable to ever safely care for C.E. Furthermore, while not necessary for a juvenile court to find if both parents are unfit, we also conclude that there was clear and convincing evidence of an exceptional circumstance that would warrant the termination of father's parental rights in this matter. Finally, the juvenile court committed an error of law when it changed C.E.'s CINA permanency plan during the termination of parental rights hearing conducted pursuant to FL § 5-323 in a single order. Accordingly, we vacate the judgment of the juvenile court and remand for further proceedings consistent with this opinion.

**Standard of Review**

"Maryland appellate courts apply three different but interrelated standards of review" when reviewing a juvenile court's decisions at the conclusion of a termination of parental rights proceeding. *In re Adoption/Guardianship of Cadence B.*, 417 Md. 146, 155 (2010).

17

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8-131(c)] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon some legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100 (2010) (alteration in original) (quoting *In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 297 (2005)).

This Court is cognizant of the fact that: "[q]uestions within the discretion of the trial court are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *Cadence B.*, 417 Md. at 155 (quoting *In re Yve S.*, 373 Md. 551, 583–84 (2003)). Legal conclusions of unfitness and exceptional circumstances are reviewed without deference. In reviewing whether the juvenile court abused its discretion, we are aware that juvenile courts must apply a statutory termination of parental rights directive to factual scenarios that are far from clear. We are mindful that "to be reversed the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *Id.* at 155–56 (quoting *Yve S.*, 373 Md. at 583–84).

## Discussion

*The Termination of Parental Rights Process*

Parents have a fundamental right under the Fourteenth Amendment of the United States Constitution to "make decisions concerning the care, custody, and control of their

children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). However, this right is not absolute. When it is determined that a parent cannot adequately care for a child, and efforts to reunify the parent and child have failed, the State may intercede and petition for guardianship of the child pursuant to its *parens patriae* authority. *In re Najasha B.*, 409 Md. 20, 33 (2009) (quoting *In re Mark M.*, 365 Md. 687, 705–06 (2001) ("The State of Maryland has a *parens patriae* 'interest in caring for those, such as minors, who cannot care for themselves' and 'the child's welfare is a consideration that is of transcendent importance when the child might . . . be in jeopardy.'"). The grant of guardianship terminates the existing parental relationship and transfers to the State the parental rights that emanate from a parental relationship. *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 496 (2007). Ideally, the State will re-transfer the parental rights to an adoptive family. *Id.*

In Maryland, Title 5 subtitle 3 of the Family Law Article governs guardianship and adoption of children in need of assistance. The expressed statutory purpose of the subtitle is to:

> (1) timely provide permanent and safe homes for children consistent with their best interests;
> (2) protect children from unnecessary separation from their parents;
> (3) ensure adoption only by individuals fit for the responsibility;
> (4) protect parents from making hurried or ill-considered agreements to terminate parental rights;
> (5) protect prospective adoptive parents by giving them information about children and their backgrounds; and
> (6) protect adoptive parents from future disturbances of their relationships with children by former parents.

FL § 5-303(b).  These express purposes illustrate the inherent tension in any termination of parental rights matter—to provide a child with permanency yet protect the parents from a hasty termination of their rights.

The guardianship proceeding commences when the Department files a termination of parental rights petition.  FL § 5-313.  A petition is required unless each parent consents to termination.  *In re Adoption/Guardianship of Jayden G.*, 433 Md. 50, 56 (2013) (citations omitted).  After a hearing[14], a juvenile court has the authority to terminate parental rights upon a finding of clear and convincing evidence that (1) the parent is unfit to remain in the parental relationship with the child or (2) exceptional circumstances exist that would make continuation of the relationship detrimental to the child's best interest.  FL § 5-323.  In determining whether to terminate parental rights, "a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests[.]"  FL § 5-323(d).

The juvenile court's inquiry is different from that of a custody case.  The relevant question in a TPR proceeding is whether the parent is unfit to continue the *parental relationship* or whether there are exceptional circumstances that make the continued *parental relationship* detrimental to the child's best interest.  *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 217 (2018) (emphasis added).  This is different from the custody

---

[14] Hearings are conducted pursuant to FL § 5-318

20

analysis in which the court is looking at whether the *custodial arrangement* is in the best interest of the child. *Id.* (emphasis added).

In acknowledgment of the important rights at stake, we have previously described three elements of heightened protection provided to parents in a TPR proceeding. *See In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 498 (2007). First, we have recognized that there is the "presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 498. Second, this presumption can only be overcome if the State establishes by clear and convincing evidence of unfitness or exceptional circumstances to justify a TPR. *Id.* at 499. This is a heavier burden than the preponderance of evidence standard utilized in a standard child custody case. *Id.* Third, the General Assembly provided factors that the juvenile court must expressly consider in determining whether termination is in the child's best interest. *Id.* While a juvenile court is permitted to consider additional factors, the statutory factors are intended to provide the basis for any termination of parental rights.

The requisite factors are codified in FL § 5-323(d). FL § 5-323(d) is divided into four subparagraphs of factors that the court must use to assess both unfitness and exceptional circumstances. Maryland's guardianship statute does not define parental unfitness or exceptional circumstances. However, the existing statutory scheme is the appropriate mechanism for the evaluation of parental fitness or the kinds of exceptional circumstances that would suffice to rebut the presumption for continuing the parental

relationship and justify the termination of that relationship. *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 715, (2011); *In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 104 (2010) ("[T]he same factors that a court uses to determine whether termination of parental rights is in the child's best interest under the TPR statute equally serve to determine whether exceptional circumstances exist."); *Rashawn H.*, 402 Md. at 499.

The four subparagraphs of FL § 5-323(d) are divided by topic and include consideration of: (1) the services that the Department has offered to assist in achieving reunification of the child with the parents; (2) the results of the parent's effort to adjust their behaviors so that the child can return home; (3) the existence and severity of aggravating circumstances; (4) the child's emotional ties, feelings, and adjustment to community and placement and the child's general well-being.[15] Ultimately, these factors

---

[15] Specifically, FL § 5-323(d) includes:
(1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
    (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and
    (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:
    (i) the extent to which the parent has maintained regular contact with:
        1. the child;
        2. the local department to which the child is committed; and
        3. if feasible, the child's caregiver;
    (ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;
    (iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community;

2. home;

3. placement; and

4. school;

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

seek to assist the juvenile court in determining "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Rashawn H.*, 402 Md. at 500. This is the appropriate inquiry because courts are required to afford priority to the health and safety of the child. FL § 5-323. As such, the best interest of the child is the overarching standard in TPR proceedings. *In re Adoption/Guardianship of Cadence B.*, 417 Md. 146, 157 (2010) (citing *Ta'Niya C.*, 417 Md. at 90) ("[T]he child's best interest remains the 'transcendent standard in adoption, third-party custody cases, and TPR proceedings.'").

Each TPR proceeding is a factual inquiry, requiring the juvenile court to render specific findings of fact to justify termination of a parent's parental rights. A juvenile court must specifically examine and consider each statutory factor. "In addition to statutory factors, courts may consider such parental characteristics as age, stability, and the capacity and interest of a parent to provide for the emotional, social, moral, material, and educational needs of the child." *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 220 (2018) (cleaned up) (quoting *Pastore v. Sharp*, 81 Md. App. 314, 320 (1989)). "[T]ermination is an alternative of last resort, and is not to be taken lightly." *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 715 (2011)).

In sum, in a termination of parental rights hearing, it is the role of the juvenile court:

> [T]o give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of

the child, and, if so, how. If the court does that—*articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

*H.W.*, 460 Md. at 219 (emphasis in original) (quoting *Rashawn H.*, 402 Md. at 501).

*The Juvenile Court's Findings: Termination of the Father's Parental Rights*

At the onset, we note it is difficult to discern from the juvenile court's order which factors were found by a preponderance of the evidence and which factors were found by clear and convincing evidence as to Father. Further, the juvenile court never fully considered the exceptional circumstances prong as a separate legal conclusion from the unfitness prong. Rather, the juvenile court used the exceptional circumstances prong in conjunction with unfitness to examine specific circumstances such as the parental bond or the Father's relationship with Mother. This was erroneous because the exceptional circumstances prong is a separate legal conclusion. Thus, the prong requires a separate inquiry apart from unfitness. If a juvenile court deems a parent fit, then the juvenile court is required to examine whether any exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child.

In examining whether an exceptional circumstance exists, a juvenile court should look to whether there is a reason to terminate the parental relationship because the best interest of the child is not served through continuing the parental relationship. Here, the juvenile court utilized this statutory basis as a shield to protect against the termination of parental rights, not as a potential separate legal conclusion apart from unfitness. This was

in error because, as we have previously stated, unfitness and exceptional circumstances are two separate inquiries.

In reviewing the remainder of the juvenile court's order, we are able to discern that the juvenile court found: (1) that the Department had made reasonable efforts to enable reunification; (2) that neither parent exhibits "essential safe parenting skills;" (3) that Father lacked housing in which C.E. could reside; (4) that, on the whole, neither parent had accomplished a material change to the circumstances rendering C.E. a CINA; (5) that C.E. has fully adjusted to his placement with Mr. and Ms. B.; (6) that neither parent had contributed support for C.E.'s care and maintenance; and (7) that reunification with the natural parents is unachievable within the foreseeable future, if ever. It is also clear that the Court's sole factual finding that weighed in favor of continuation of Father's parental rights was a determination that C.E. knew and was attached to Father. In sum, as we understand the juvenile court's order, almost every other factor delineated under FL § 5-323(d) was found against Father with the exception of the finding that there is an "attachment" between Father and C.E.

The Department and C.E. assert that in declining to terminate Father's parental rights, the juvenile court failed to give appropriate consideration to the safety and welfare of C.E. Further, the juvenile court ignored one of the goals of subtitle three, permanency, and failed to afford appropriate weight to the question of "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." The Department and C.E. argue that the juvenile court afforded too much credit to the relationship between C.E. and his father in lieu of giving proper credit to the

other statutory factors.  C.E. and the Department contend that the juvenile court properly found Mother unfit by clear and convincing evidence.  Now, the Department and C.E. assert that there was ample evidence to find that Father was unfit or that exceptional circumstances existed by clear and convincing evidence to terminate his parental rights as well.  We agree.

*Permanency and Unfitness*

A CINA child's statutory right to permanency is derived from Maryland's incorporation of two federal statutes: the Adoption Assistance and Child Welfare Act of 1980 (hereinafter "AACWA"), Public Law 96-272, codified at 42 U.S.C. 670 (1988) and the Adoption and Safe Families Act of 1997 ("ASFA"), Public Law 105-89, codified at 42 U.S.C. Chapter 7, subchapter IV.  "ASFA's emphasis on legally secure permanent placement is meant to provide the child with psychological stability and a sense of belonging and to limit the likelihood of future disruption of the permanent relationship." LaShanda Taylor Adams, *Backward Progress Towards Reinstating Parental Rights*, 41 N.Y.U. Rev. L. & Soc. Change 507, 515 (2017).

> The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life.  The valid premise is that it is in the child's best interest to be placed in a permanent home and to spend as little time as possible in foster care.

*In re Adoption/Guardianship of Jayden G.*, 433 Md. 50, 84 (2013) (citing *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 106 (1994)).  "Permanency for children means having 'constant, loving parents,' knowing 'that their homes will always be their

27

home; that their brothers and sisters will always be near; and that their neighborhoods and schools are familiar places.'" *Id.* at 82–83.

The controlling factor in a termination of parental rights proceeding is not the natural parents' interest in raising the child or the bond between the parent and child, but rather "what best serves the interests of the child. . . . in all cases where the interests of the child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of 'transcendent importance.'" *In re Adoption/Guardianship No. A91-71A*, 334 Md. 538, 561 (1994) (cleaned up). In this case, the juvenile court overemphasized the bond between the Father and the child and failed to properly consider permanency and the ability of the father to successfully parent C.E in a stable environment. As such, this case is distinguishable from *In re Adoption/Guardianship of Alonza D.*, in which we found the parental relationship should not be severed when the fitness of the father was not at issue and there were no compelling exceptional circumstances. 412 Md. 442, 443 (2010).

In *Alonza D.*, the father appealed the termination of his parental rights. *Id.* The juvenile court considered the father fit, but ultimately concluded that exceptional circumstances—namely the six years the children were out of the care of their father during which the children developed a strong bond with their foster mother—warranted termination of his parental rights. *Id.* at 448–49. In weighing exceptional circumstances, the juvenile court did not find that a continued relationship with the father would be detrimental to the children or that he was currently unfit. *Id.* The father at the time of the hearing had secured housing and had achieved stability throughout other areas of his life.

28

On review we held "[p]assage of time, without explicit findings that the continued relationship with [the father] would prove detrimental to the best interests of the children, is not sufficient to constitute exceptional circumstances." *Id.* at 463.

In the matter before us, the record is replete with instances where a continued relationship with Father would cause detriment to C.E.'s health and welfare, especially with the extra care necessary for C.E.'s needs. Additionally, while the father in *Alonza D.* was undoubtedly fit, the same cannot be said of C.E.'s Father. Father has failed to secure housing that is suitable for C.E. and there are numerous concerns about Father sustaining energy levels sufficient to care for C.E. The juvenile court should have found that a continued relationship with Father would be detrimental to C.E.'s health and welfare. All of the statutory factors deserve equal consideration when weighing unfitness. Father and C.E.'s relationship is only one factor to consider during the juvenile court's evaluation. Here, the juvenile court impermissibly elevated the parent-child relationship as a factor that surpasses all others.

As with the parent-child relationship, we decline to elevate permanency above all other factors as the Department and C.E. requested. Permanency, like all the factors the General Assembly codified, is one aspect to consider in a TPR proceeding. However, we do note that in this case, the juvenile court erred in its assessment of permanency.

In reviewing permanency, we use *In re Adoption/Guardianship No. 10941* as guidance. 335 Md. 99 (1994). In *No. 10941*, this Court reversed the juvenile court's findings that it was not necessary to terminate the mother's parental rights to achieve

permanency because the child could remain in the custody of his grandparents. *Id.* at 120.

Specifically, the juvenile court found:

> The [c]ourt finds that it would be contrary to the Child's best interest to be removed from the custody of the maternal grandparents. The [c]ourt further finds that continued placement of the Child with the Grandparent's [sic] does not require that the Mother's parental rights be terminated. The Child is presently in a stable environment with his grandparents and this environment provides him with the security and sense of belonging to a family that is the goal of adoption.

*Id.* at 119–20. This Court determined "[o]nly termination of parental rights and a subsequent permanent placement, such as adoption sought by the grandparents here, can provide [the child] with the permanency he needs and the Legislature intended." *Id.*

Here, the juvenile court attempted to bypass the lack of permanency afforded to the child in *No. 10941*. In conjunction with declining to terminate Father and Mother's parental rights, the juvenile court altered C.E.'s permanency plan in the CINA matter to custody and guardianship with Mr. and Ms. B. We will address the merits of this approach below but note here that the remedy deprived C.E. of the preferred permanency status as provided by statute.

Custody and guardianship with a relative is considered a permanent placement for a CINA child. Pursuant to CJP § 3-819.2(c), a child's placement with a relative for custody and guardianship terminates the legal obligations and responsibilities of the Department. In considering the appropriate permanent placement, juvenile courts are guided by the hierarchy of permanency plans codified in CJP § 3-823(e)(1) and FL § 5-525. Both statutes prioritize placement options in descending order: 1) reunification with the child's parent or guardian; 2) placement with a relative for adoption; 3) placement with a relative for custody

30

and guardianship; 4) adoption by a nonrelative; and 5) custody and guardianship by a nonrelative. Here, the juvenile court ignored the order of priority as well as our line of cases holding that when reunification with the child's parents cannot be achieved, adoption is the next best option. *See No. 10941*, 335 Md. at 120–21.[16]

Custody and guardianship does not afford C.E. with the same permanency as adoption with a relative. *See In re Caya B.*, 153 Md. App. 63, 78 (2003) ("Parental rights are not terminated in such a situation: the parents are free at any time to petition an appropriate court of equity for a change in custody, guardianship, or visitation."). As in *No. 10941*, while there is no doubt that Mr. and Ms. B. currently desire to adopt C.E., if they are not his legal parents, they may decide later, for whatever reason, that they are no longer able to care for C.E. 335 Md. 99 at 120. Especially with the additional administrative burdens that come with custody and guardianship as opposed to an adoption, custody and guardianship with Mr. and Ms. B. is not the preferred permanency solution.[17] "[T]ermination of parental rights is the necessary next step when reunion with the natural parent is not possible." *No. 10941*, 335 Md. at 120–21. Here, the juvenile court found that Father could never safely care for C.E., and erred when not considering the effect of his

---

[16] There may be instances when adoption is not the most appropriate permanency goal and a long-term placement is more appropriate. *See In re Adoption/Guardianship of Victor A.*, 386 Md. 288 (2005). We do not believe the record reflects that the juvenile court was presented with any compelling reason to continue long-term placement over the statutory preference in this matter.

[17] For example, FL § 9-104 states: "Unless otherwise ordered by a court, access to medical, dental, and educational records concerning the child may not be denied to a parent because the parent does not have physical custody of the child."

inability to care for C.E. on C.E.'s permanency and how that relates to Father's unfitness. Given these various factors, the trial court abused its discretion in declining to terminate father's parental rights under the unfitness prong.

*Exceptional Circumstances*

Even assuming arguendo that Father was fit, there was also an important exceptional circumstance that the juvenile court failed to give sufficient consideration and that would have warranted the termination of parental rights in this matter. When the juvenile court combined the fitness and exceptional circumstances analysis, the juvenile court did not fully examine this important statutory prong.

In reviewing the exceptional circumstances basis, we are concerned with the continuing relationship between Father and Mother. Father testified that he refuses to sever his relationship with Mother, that he will continue to live with Mother, and that he will rely solely on her for providing childcare to C.E. while he is at work. Further, Father refuses to acknowledge Mother's mental health conditions despite the fact that Mother is undoubtedly unfit to care or be left alone with C.E. Father has adopted Mother's mentality that the State is impermissibly seeking to impede on their rights to raise C.E. These facts endanger C.E.'s health and welfare.

We found cases similar to the case *sub judice* in our sister jurisdictions. In *State ex rel. Dept. of Human Services v. R.O.W.*, the Oregon intermediate appellate court reviewed a termination proceeding and concluded that there was clear and convincing evidence that the mother was unfit and that there was clear and convincing evidence the father was unfit

because the father refused to make the necessary adjustments to protect their minor child from the dangers of the mother's care. 215 Or. App. 83, 85 (2007).

In *R.O.W.*, mother had cognitive limitations that prevented her from learning how to care for or appropriately respond to her child. *Id.* Father had some alcohol, drug, and mental health issues that were not disqualifying on their own to declare him unfit. *Id.* at 100. However, the court concluded termination of his parental rights was warranted because those factors, in addition to his failure to obtain and maintain suitable housing and his failure to recognize the danger the mother posed to the child, "are directly and seriously detrimental to [the child] when considered in the context of his relationship with mother." *Id.* at 100. The Court recognized:

> Although father's conduct or conditions might not support termination when considered in isolation, they are directly and seriously detrimental to [the child] when considered in the context of his relationship with mother. Father's lack of effort to obtain and maintain a stable and suitable living situation—namely, one in which [the child] will be protected from the dangers she would face in mother's care—renders him unfit to parent [the child]. Father historically has failed to recognize the importance of ensuring that mother is constantly supervised when [the child] is in her care and has demonstrated an unwillingness—and inability—to protect [the child] from mother.

*Id.* at 100–01.

Further, in *New Jersey Division of Youth & Family Services v. M.M.*, New Jersey's highest court reviewed whether the trial court properly terminated a father's parental rights when "the court concluded that the son was at risk because of the mother's destabilizing influence on the home." 189 N.J. 261, 267 (2007). The court affirmed the trial court finding that the "father did not establish a safe and stable environment for his son." *Id.*

33

Mother was not capable of caring for her child.  *Id.*  Father, on the other hand, had overcome his troubled past and was dedicated to raising his son.  *Id.*  Despite the father's fitness, the court determined that "although the father [did] not pose a direct threat to his son, the evidence demonstrate[d] that he did not provide for the son's special needs or mitigate the effects of the harmful environment in which he intends to raise the son."  *Id.* at 267.

The Court, "mindful of the mother's limitations" stated, "it is the father who established the dangerous situation at home, who maintains those conditions, and who is unable or unwilling to substantially alter those conditions."  *Id.* at 282.  Further the Father did not seem to understand the limits of his son or made excuses for the behavior of the mother.  *Id.* at 284.  In support of their conclusion, the Court noted:

> Parental rights are individual in nature and due process requires that fitness be evaluated on an individual basis.  That said, the conduct of one parent can be relevant to an evaluation of the parental fitness of another parent. . . . The crucial inquiries are whether the parent's association with others causes harm to the child and whether the parent is unable or unwilling to provide a safe and stable home.

*Id.* at 289–90 (cleaned up).  The mother's presence in the home was pertinent to the inquiry of whether father was placing the child into a risk of harm.  *Id.*  Therefore, the termination of the father's rights was not in error.

Similar to both *R.O.W.* and *M.M.*, Father has not shown he can be a placement resource for C.E.  He refuses to sever his relationship with Mother and seeks to place C.E. exclusively in her care while he works.  He fails to recognize the threat Mother is to C.E.'s safety and welfare.  He does not acknowledge that Mother has any mental illness despite her formal diagnosis and lengthy history with the Department.  At no point in the record

has Mother proven that she is capable of safely caring for C.E., thus C.E. is placed in danger whenever in her care.[18]  Furthermore, he has refused to obtain a residence in which C.E. may permanently reside.  In reviewing these factors, the trial court abused its discretion in declining to find exceptional circumstances to terminate the Father's parental rights.  Father's continued parental relationship with C.E. is detrimental to C.E.'s safety and welfare.  Thus, since his parents are not a placement resource, the juvenile court should have looked to the next best thing—termination of parental rights to permit guardianship and adoption.

*Additional Action during a Termination of Parental Rights Hearing*

All parties are in apparent agreement that the juvenile court erred in addressing the change in C.E.'s permanency plan in his CINA case in the same order denying the Department's petition to terminate parental rights.  Father maintains, however, that any error is harmless, because the error could be rectified by separating the order into two distinct orders.  FL § 5-324(a) provides that, in a separate order accompanying an order denying guardianship, the juvenile court shall include any order under Title 3, Subtitle 8

---

[18] Many cases of mental illness can be treated and managed and need not be cause for termination of parental rights.  In every case, the Department should work with parents with mental illness to provide resources to seek reunification of the parent and child first.  Here, however, Mother has an extensive history of mental illness in which she refuses to seek appropriate treatment and has a history of lashing out and placing her children in danger.  Mother has shown time and time again that she is incapable of caring for her children.  Like both cases in our sister jurisdictions, the fact that the child is not sufficiently protected from the effects of the mental illness, not the mental illness itself, may indicate termination of the parental rights is the only option.

of the Courts and Judicial Proceedings Article that is in the child's best interests, *e.g.*, an order with respect to a change in permanency plan.

Here, the juvenile court did not comply with this directive because it did not issue a separate order changing C.E.'s permanency plan to long-term relative guardianship. As such, the juvenile court's opinion/order raises doubt as to whether the juvenile court reached its conclusions regarding the termination of parental rights and a change in the permanency plan in the proper manner—*i.e.* whether the two related but distinctly different concepts were afforded independent consideration.

Reading the juvenile court's opinion/order, it is difficult to differentiate the FL § 5-323 termination of parental rights analysis from the analysis of the change of permanency plan. A striking example of this lack of clarity is the juvenile court's interwoven analysis of issues upon both a "more likely than not" or preponderance of the evidence standard, and a clear and convincing evidence standard. In another instance, the juvenile court concluded that exceptional circumstances required a change of permanency plan when parental unfitness or exceptional circumstances are required to terminate parental rights. To be sure, not every instance of procedural non-compliance constitutes reversible error. A juvenile court's failure to issue separate opinions/orders may not, in and of itself, be sufficient grounds for reversal. In this instance, however, it is not possible to conclude that the juvenile court conducted a separate analysis with respect to the termination of parental rights and a change in permanency plan. As we are remanding this matter for further proceedings, the juvenile court will have the opportunity to remedy this error.

We also note that even though the juvenile court certainly had the authority to alter the CINA child's permanency plan during a TPR hearing, a best practice for juvenile courts is to separate the proceedings into two hearings. Separate proceedings are especially important in difficult factual situations such as this one. If a juvenile court denies the TPR proceeding, a permanency placement review hearing should be scheduled in the original CINA case on a separate date. This is optimal because a CINA permanency hearing and a TPR hearing are seeking to resolve related, but, ultimately distinct issues. *See In re Adoption/Guardianship of Cross H.*, 200 Md. App. 142, 152 (2011) (noting "the appropriate focus of the TPR hearing was not the potential suitability of the parental grandmother as a placement for [the child]—as this was an issue properly addressed in the CINA case—but rather, the fitness of [Mother] and [Father] as parents").

The purpose of CINA proceedings is "[t]o provide for the care, protection, safety, and mental and physical development" of CINA children; "conserve and strengthen the child's family ties;" "remedy the circumstances that required the court's intervention;" and "achieve a timely, permanent placement for the child consistent with the child's best interests." *In re Adoption/Guardianship of Jayden G.*, 433 Md. 50, 75 (2013) (citing CJP § 3-802(a)). A TPR, conversely, is initiated once the Department is seeking to terminate the existing parental relationship. *Id.* In addition to separate purposes, TPR and CINA proceedings consider different factors and have different evidentiary burdens. *Id.* at 77.

In this matter, separate proceedings would have allowed Mr. and Ms. B to consider whether they wished to continue as C.E.'s guardian rather than as an adoptive resource. Further, the juvenile court could have determined the extent to which Mother and Father

37

were granted visitation and other aspect of the custody and guardianship. We also believe this would have also likely remedied many of the issues with the juvenile court's order that we have outlined above. Therefore, we recommend separate proceedings in the future.

**CONCLUSION**

Overall, based on the juvenile court's order, it is not possible to affirm the juvenile court's decision declining to terminate Father's parental rights. We are concerned with the court's findings as specified above and with the lack of clear articulation of the appropriate burdens of proof. The finding that Father was not unfit is contradicted by the juvenile court's finding that reunification with either Father or Mother was not attainable within the foreseeable future, if ever. Further, exceptional circumstances existed, specifically the Father's reliance on the Mother for housing and childcare for C.E., that would warrant termination of Father's parental rights.

In regard to the order, although the juvenile court purported to make this finding by a preponderance of the evidence, it is unclear why the juvenile court would be using a preponderance of the evidence standard in assessing the termination of Father's parental rights. It is impossible to conclude that the juvenile court's concurrent consideration of a change in the permanency plan did not affect the ultimate disposition of the termination of parental rights hearing. Therefore, we shall direct that the judgment of the Circuit Court

for Baltimore City, sitting as a juvenile court, be vacated and that this case be remanded

for further proceedings consistent with this opinion.[19]

**ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY, SITTING AS A JUVENILE COURT, IS VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS.**

---

[19] We vacate the August 13, 2018 opinion that we withdrew by Order of this Court on December 3, 2018. Thus we leave intact the juvenile court's finding that Mother is unfit and on remand, the juvenile court may take any appropriate action with respect to the termination of Mother's parental rights after further proceedings consistent with this opinion with respect to Father.