*In re: Adoption/Guardianship of J.T.*, Nos. 2811 & 3098, September Term, 2018, Opinion by Adkins, J.

**FAMILY LAW – TERMINATION OF PARENTAL RIGHTS – BEST INTERESTS OF THE CHILD – WITHDRAWAL OF FOSTER FAMILY**: The juvenile court knew about the withdrawal of the child's foster family before it released the decision to terminate parental rights of the mother. When a court's assessment of a child's best interests was affected by consideration of the apparent stability and safety a former foster family provided, it errs in failing to fully discover and address how the withdrawal of the foster family might affect the child emotionally or a new placement. These considerations are especially crucial when the child's only remaining permanent attachments are her biological mother and father.

**FAMILY LAW – TERMINATION OF PARENTAL RIGHTS – FAMILY LAW ARTICLE § 5-323 – PARENT'S MENTAL ILLNESS**: The juvenile court abuses its discretion when it terminates a mother's parental rights without taking into consideration her marked improvement through medicine and therapy. This consideration is especially important where the mother acknowledges that she suffers from mental illness, there is no history of abuse or neglect of the child, and the mother's poverty substantially contributes to her inability to maintain a home for the child. The court's inquiry should have considered the mother's progress in her therapeutic and medical regimen in deciding whether her constitutional rights were impaired by the proposed termination order.

Circuit Court for Montgomery County
Petition No. 06-Z-17-33

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 2811 & 3098

September Term, 2018
_____

CONSOLIDATED CASES
_____

IN RE: ADOPTION/GUARDIANSHIP OF J.T.

_____

Kehoe,
Leahy,
Adkins, Sally D.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Adkins, Sally D., J.
_____

Filed: July 31, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Although mental illness may play a role in many termination of parental rights cases, it is uncommon in an appellate court that the illness presents itself as the centerpiece issue—without the concomitant issues of child abuse or abandonment. In this case, we are called upon to address a parent's mental illness, the best interests of a child, and a mother's ability to parent given her progress made through therapy and medication. These issues are all the more essential and poignant given the foster parents' sudden withdrawal from adoption plans.

## FACTUAL OVERVIEW AND PROCEDURAL POSTURE

### Legal Proceedings

Appellant T.N. ("Mother" or "T.N.") gave birth to J.T., a healthy daughter, on April 1, 2016. On May 26, 2016, after petition by the Department of Social Services for Montgomery County, Maryland ("the Department" or "DSS"), J.T. was determined by the juvenile court to be a child in need of assistance ("CINA") and committed to the care and custody of the Department. DSS alleged that Mother was unfit to parent J.T. It also asserted that the parental rights of J.M., the child's father ("Father"), should be terminated due to exceptional circumstances. In August 2018, following the CINA proceedings, a termination of parental rights ("TPR") trial was held (Case No. 2811). The Circuit Court for Montgomery County terminated Mother's and Father's parental rights pursuant to its November 2018 Order. Both Mother and Father appeal from this Order. In a parallel proceeding, the juvenile court ordered that Mother's visitation with J.T. be reduced. Mother appealed the change in the visitation schedule to this Court (Case No. 3098), and the two appeals have been consolidated, without objection.

**Questions Presented by Mother**

1. Did the juvenile court err in terminating Appellant T.N.'s parental rights to J.T.?

2. Did the juvenile court err in reducing visitation?

3. Did the juvenile court err in terminating Appellant J.M.'s parental rights to J.T.?

As to the first and third questions, we hold that the juvenile court erred in terminating the rights of Mother and Father, and we reverse and remand to the juvenile court for further proceedings. Because we remand to the juvenile court to reconsider the parental rights of both Mother and Father, and J.T.'s best interests, we also direct that Mother's visitation schedule return to two times per week, the frequency Mother earlier enjoyed before it was reduced at the request of DSS (to correlate with the expected termination).

In this appeal we focus on the arguments made by Mother and the Department's response thereto. Father, who lives in Cameroon, also contests termination of his parental rights. He challenges the juvenile court's exercise of personal jurisdiction over him and argues, *inter alia*, that exceptional circumstances were not shown, and the court should not have drawn a negative inference from his failure to testify. Throughout most of this process, Father has supported Mother's right to the care and custody of J.T., with the understanding that Mother and child would live in the United States. While he, at one point—fearing Mother's parental rights would be terminated—asserted his own right to custody of J.T. in Cameroon, Father's final word, expressed by counsel at oral argument, was that he preferred that Mother retain her parental rights and eventually be given custody of J.T. Because of Father's deferral to Mother and her parental rights, and because

2

ultimately, we reverse the juvenile court and ask that court to reconsider the determination of both parents' rights, we do not address Father's arguments on his own behalf. On remand, however, Father is still free to protect his own parental rights, or to argue on behalf of Mother.

### Facts[1] and Procedures

In April 2016, shortly after Mother gave birth to J.T., Mother experienced a mental health crisis while still in the hospital and showed signs of postpartum psychosis. Hospital staff removed J.T. from Mother's care, and Mother was transferred to a psychiatric unit. J.T. was placed in kinship care with a licensed foster parent who was a friend of Mother's. Father has been unable to secure a U.S. visa to travel to this country. While both parents resided in Cameroon, they agreed that Mother, a college graduate who had a Green Card allowing her to work and live in the United States, would travel to this county so that J.T. would be born here. In September 2016, Father sent an email to the Department saying that he wanted J.T. reunified with Mother.

Mother's bout with postpartum psychosis was not the first time she had suffered serious mental health problems. She was hospitalized in 2013 and 2015 and attempted suicide in 2014. According to a psychological evaluation, Mother suffers from post-traumatic stress disorder and recurrent major depressive disorder with psychotic features. During depressive episodes, Mother experiences insomnia, psychomotor agitation, fatigue, and mood instability. During these episodes she sometimes has auditory hallucinations,

---

[1] We draw the facts from testimony at trial and the Department of Social Services ("the Department" or "DSS") reports that were entered into evidence.

3

wherein she hears voices telling her she is going to die. Major stressors in her life may trigger a depressive episode. At one low point in May 2016, Mother is reported to have stated that "the voices have taken over her body and she is concerned 'that they might hurt me.'"

According to social workers and psychologists who have dealt with Mother, she can successfully manage her illness with therapy and medication. They also cautioned that her symptoms will return if medication is interrupted. The psychologist who evaluated Mother in June and July of 2016 recommended that she receive "case management support to assist her in accessing resources, including but not limited to," subsidized and transitional housing, where her daughter could reside with her. During the months leading up to the TPR hearing, Mother lived in a transitional housing facility operated by Catholic Charities, known as "Dorothy Day." Mother stayed in regular contact with the Department, and regularly attended scheduled visits with J.T.

Mother's social worker at Dorothy Day has described her as "extremely reliable" and said that "[she hadn't] had any problems with [her] in her reliability and her punctuality and her completing tasks . . . and her communication . . . ." Her first DSS social worker, Jillian Kelly ("Kelly"), testified that "[w]hen [Mother] is on the right medication and being properly monitored she can do well." Her second DSS social worker, Marwan Castellani ("Castellani"), testified that she was "very cooperative" with the Department, reliably participated in visits, and had positive interactions with J.T. Castellani concurred that, with housing and mental health support, including therapy and medication, Mother functioned well in the community. The psychologist who conducted Mother's mental health

4

evaluation testified that she was "completely cooperative" and "insightful" about her mental health issues.

The Department facilitated Mother's visits with J.T. while J.T. was in foster care. When healthy, Mother had positive, affectionate visits with J.T. They grew an increasingly strong bond, but they would need to reestablish their bond after periods when Mother was hospitalized and visits were put on hold. Visits changed from supervised to unsupervised in September 2016 and occurred once each week for one hour. The psychologist who evaluated Mother testified that her "face lit up" when talking about J.T., and she was "eager to share photos." Mother "expressed a realistic understanding of what caring for a baby full time entails" and was "cognizant of the responsibilities inherent in that."

Periodic review hearings are required for all CINA children. *See* Md. Code Ann. (2005, 2012 Repl. Vol.), § 5-326 of the Family Law Article ("FL"). The Department prepares reports for the juvenile court shortly before every review hearing, and these reports are admitted into evidence at the merits hearing. At the September 14, 2016 review hearing, the Department reported that Mother had "shown significant progress in maintaining her mental health and working toward reunification with her daughter. She had attended every visit with [J.T.] and consistently demonstrates skills learned from parenting education." It also expressed that mother and daughter were developing a strong bond, and that the Department wished for Mother to be able to spend more time with J.T., progressing to overnight visits. It reported that Mother had not needed hospitalization since May 2, 2016 and had not reported any psychotic symptoms to the Department or her therapist.

Around December 2016, Mother became pregnant again and this appeared to affect her mental health adversely. Kelly, Mother's initial DSS social worker, filed a February 22, 2017 report stating that Mother told her that she had been advised to discontinue all medications due to her pregnancy. Kelly estimated that she had stopped taking her medication in November or December 2016, around the time Mother suffered a panic attack that resulted in her hospitalization.

While Mother was residing with a friend in Southeast Washington, District of Columbia, the Department arranged for J.T. to stay with Mother for a few days over Christmas. Arrangements were made for the Department to pick J.T. up on December 27, 2016 and take J.T. back to her foster home. Mother was to meet the Department representative in Silver Spring, Maryland to facilitate this. But, on that day, Mother called the Department and asked for J.T. to be picked up at the apartment, as Mother was not feeling well and did not want to travel to Silver Spring. When the social worker picked up J.T., Mother was acting oddly, with symptoms of a panic attack. Two days later, on December 29, 2016, police observed Mother screaming and dancing in the road. An officer found a DSS business card in Mother's purse and called the Department.

Mother was taken to the emergency room and was stabilized and released after a 48-hour stay. She then went to Progress Place, a shelter in Silver Spring, seeking a place to stay. While there, she became upset at having to sleep in the same room with other women, was loud, aggressive, and argued with staff members and even attempted to spit on a staff member. Police were called, and she was banned from Progress Place for a year.

6

During early January 2017, Mother was brought to Washington Adventist Hospital by police and admitted. After her admission, hospital staff described her as being agitated and fixated on her scheduled visit with J.T. Mother repeatedly called the Department asking that a social worker either pick her up from the hospital or bring J.T. to her. Her hospital-assigned counselor said that Mother was refusing to take medication.[2] Mother remained at Washington Adventist Hospital until January 13, 2017, gradually responding to treatment.[3] She was released, after taking her medication, with a diagnosis of Bipolar I with psychotic features. Because the Montgomery County Crisis Center did not have any open shelter beds, social workers arranged for her to go to Harriet Tubman Emergency Women's Shelter, but the security guard refused her entry, despite her begging to be admitted. She then was admitted to the psychiatric unit of Howard University Hospital, where she remained from January 17–24, 2017.

At about this time, Mother met with the Department and reported that she had stopped taking her Seroquel, a prescribed medication, as it was making her sleepy and she did not want to be tired or inattentive when caring for J.T. during her extended, unsupervised, and overnight visits. She also told the Department that she felt overwhelmed with her overall situation. She identified the father of her unborn (second) child and explained that when she informed him of the pregnancy, he denied being the father. This

---

[2] As discussed, Mother was pregnant with her second child at this time and was advised not to take any medication.

[3] Mother initially exhibited paranoia about the staff and other residents, such as accusing residents of trying to kill her.

was greatly upsetting to her, she explained, because he had promised to marry her and take care of her and the child.

Mother also informed the Department that she found a different shelter, Winter Haven Emergency Shelter in Silver Spring, and she intended to resume her job as a home health aide, while continuing to see her therapist and psychiatrist. The social worker observed Mother to be more sluggish than usual around this time, which Mother owed to her pregnancy. During this same period, Mother had supervised visitation with J.T. on January 25, February 1, and February 8, 2017.

Another depressive episode occurred around mid-February 2017. The Director of the Winter Haven Emergency Shelter, Dr. Donna Robinson, stated that she became concerned because Mother appeared depressed and anxious, and exhibited involuntary motions causing her to hit herself. The Director transported Mother to Holy Cross Hospital, but when Robinson tried to visit with her two days later, she was informed that Mother was not in the hospital. The Department learned that on February 11, 2017, Mother was transferred to Brook Lane, a mental health hospital. At this point, the permanency plan for J.T. was reunification with her mother, and the Department, noting that Mother's decompensation was very recent, did not ask to change the plan. Still, DSS planned to return to juvenile court in three months to possibly revise the permanency plan to "adoption by a relative or a non-relative."

The Department also advised the court, in its above-discussed report for the March 3, 2017 Permanency Plan Hearing, that it was

important to note that [J.T.] [had] been with the same foster family since May 26, 2016 and is attached to them. Given the significance of attachment and bonding during infancy, the Department and Court also need to consider [J.T.'s] attachment to her foster parents in considering a permanent resource for her.

Castellani, her second DSS social worker, formally assigned to J.T.'s case on April 28, 2018, also testified about the strength of her bond with her foster family. He opined that it was contrary to J.T.'s best interest to be removed from foster placement for any reason, including to be placed with a biological parent. Castellani also said that, during the most recent two visits, J.T. did not cry upon leaving her foster parents to visit Mother.

Our next snapshot of Mother is derived from the August 18, 2017 report by the Department to the juvenile court. After a week at Brook Lane, Mother was still exhibiting symptoms of anxiety and depression, and her pregnancy limited the medications she was able to take. In March 2017, Mother received electroconvulsive therapy at University of Maryland Medical Center and was discharged on March 23, 2017. Her physician reported that, on discharge, Mother denied any auditory hallucinations or other psychotic symptoms, that she had improved mood and wider affective range, and was more responsive, including laughing and smiling. She had also "resolv[ed]" her suicidal ideations. She still, however, remained anxious and spoke very little.

Mother then went to live in an assisted living facility in a residential rowhouse in Baltimore, where she received medication, monitoring, and assistance with meals, laundry, and other basic personal needs, by on-site staff. This residential program was operated by Chesapeake Connections, a mental health services provider. Her case manager at this

program reported that Mother was working "on strengthening her independent skills by encouraging and allowing her to complete medical appointments on her own, regularly taking public transportation on her own and shopping on her own." The psychiatric nurse practitioner reported that Mother was "in compliance with treatment and 'appears to be doing well psychiatrically and mentally'" and "her prognosis appears to be fairly good if she continues to comply with medications, participate in psychotherapy and receive supportive services." While she lived in this residential facility, Mother had visits with her daughter, and, after an initial period of uneasiness, J.T. settled down and visits became better, with mother and daughter engaging in reciprocal play, reading stories, and changing the child's diaper.

In this same August 18, 2017 report, the Department stated that J.T. was doing well, and that Mother "is able to sustain brief periods of stability when she is taking her medication as prescribed, [but] any deviation from her medical regimen or exposure to stressors has shown to lead to a reoccurrence of her psychiatric symptoms." The Department expressed concern about the proposed plan by Chesapeake Connections to transfer Mother to a less restrictive environment when she gives birth, as she "currently is not demonstrating independent living skills in her current residence." DSS acknowledged that "[J.T.] does exhibit a connection to her mother" and they "engage in play and are affectionate with each other," but maintained that J.T. "cannot be safe in her care." The Department emphasized that J.T.'s "strongest attachment is to her foster parents," along with "the potential emotional, developmental, and educational harm to the child if moved from the current placement . . . ."

After this hearing, the juvenile court changed the permanency plan from "Reunification" to "Adoption by a Non-Relative." The court found that "[J.T.'s] mother . . . still struggle[d] with her mental health and stability. She [currently lived] in a treatment facility and [was] still unable to care for [J.T.]" The court also found she had "made minimal progress toward alleviating or mitigating the causes necessitating the commitment. While there was some progress, that has been followed by multiple additional hospitalizations." It also noted that J.T. was "safe in meeting her developmental milestones in her foster care placement."

In its January 22, 2018 report to the juvenile court, the Department stated that Mother's second daughter ("G.N.") was born on September 3, 2017. Mother and G.N. were moved into an apartment managed by a mental health care organization, Uplift Individuals in Christ. But, it explained, two weeks later, Mother was admitted to Johns Hopkins University Hospital on an emergency basis. In this report, the Department recommended that J.T. remain in foster care, with a permanency plan of adoption by a non-relative. DSS maintained that J.T. was in a loving and stable foster home and the foster parents were committed to adopting her.

Another review hearing was set for June 6, 2018. The Department's May 25 report for this hearing described the favorable conditions with J.T.'s foster family and characterized J.T. as a two-year-old toddler who is happy, well-adjusted and meeting developmental milestones. DSS reported that the foster family had embraced J.T. into their family and integrated her into their lives, including extended family, and that "the family is strongly committed."

11

As to Mother, the Department had become pessimistic about her ability to parent. It reported that Mother's

> history with Child Welfare Services has demonstrated concerning behaviors related to her anxiety and hallucinations resulting in an inability to meet the needs of her daughter [J.T.], now two years old, as well as her daughter [G.N.], now 8 months old.
>
> During this reporting period [Mother] has been able to maintain her stability by attending regular therapy and medication management. There have been no psychiatric hospitalizations.

At the time of this report, Mother lived at Dorothy Day Transitional Housing Program through Catholic Charities in Rockville, Maryland. Despite its pessimistic view, the Department recounted a positive report from a social worker, saying that

> [Mother] is motivated to better herself, is currently medication compliant and will be working with DORS to explore obtaining part-time work. The worker further noted that [Mother] would like to eventually be able to leave the "shelter system" and get her own apartment; the current program allows [Mother] to remain there for up to one year.[4]

The Department acknowledged that "[Mother] was relatively consistent with her weekly visitation schedule" but sprinkled its report with small negative notes about Mother.

---

[4] This quote is from Castellani, a DSS social worker. He took over when Kelly left the Department in March 2018. He testified that Mother had been cooperative and continued to have physical, in-person visits with J.T. He observed that she had been mentally stable; he did not have any concerns about leaving mother unsupervised with her child for short periods of time (e.g., to change a diaper, etc.), and increased Mother's visit with child to two hours in length. Castellani testified that J.T. had deepened her bond with Mother and kissed and cuddled her during visits. He also testified that Mother is cooperative and regularly visits with J.T., and that she continues to attend therapy, seek independent living arrangements, and attempts to obtain employment.

For example, it noted that two-year old J.T. was distressed whenever the Department staff picked her up from her foster home to go anywhere, including to Mother's. Also, the Department reported that although Mother was very affectionate with J.T. during their visits, J.T. "appeared to tolerate her mother's affections" and usually played independently from her mother. In contrast, it emphasized that "[J.T.'s] energy and engagement with her foster family indicates that she has a secure and trusting relationship with her current caregivers." The Department concluded that it was "currently not in [J.T.'s] best interest to return to the care of her mother as her mental health remains unpredictable; thus her ability to provide a safe and stable environment."[5]

Sadly, the foster parents did not prove to be a stable long-term resource for J.T. Significantly, the court was notified *after* the close of the evidentiary hearings, that on October 1, 2018, the foster parents, with whom J.T. had lived for over two years and to whom she was attached, had asked the Department to remove J.T. from their home. The Department gave no reasons for the foster parents' decision. J.T. was placed with another foster family immediately.

Despite this setback in the long-term plans for J.T.'s future, the Department did not change its recommendation and the Circuit Court followed the Department's lead. In its November 15, 2018 Amended Final Order, the juvenile court terminated Mother's parental rights. The court found:

---

[5] In considering Father's request that J.T. be returned to his custody, the Department points out poverty and other features of life in Cameroon, and that "she does however have strong ties to Maryland, her current foster family, and their extended family in the community she lives in."

13

> [T]here is clear and convincing evidence that [Mother] is unfit
> and unable to care for [J.T.] [Mother] cannot provide a safe
> and stable home for [J.T.] and many of the issues that [Mother]
> present[ed] in 2016, prompting [J.T.]'s removal from her care,
> were still present at the trial. [Mother] has not stabilized her
> mental health, has not established an ability to care for [J.T.] in
> a safe environment, and has not secured appropriate housing.

It also noted that Appellant has had difficulty obtaining "employment" and "a stable income."

In its opinion, the juvenile court recited that J.T. had been removed from the home of her foster parents and placed in another foster home. It said nothing about how this impacted the best interests of J.T. This might be because the court was given insufficient information, as it stated that "[n]o supplemental information was provided to the Court on this factor."

The juvenile court determined that the Department's efforts "satisfied what was required to provide reunification services to both parents." It concluded that after weighing the "statutory factors in light of the requisite legal presumption, [there was] clear and convincing evidence that it is in the best interest of this Child that the parental rights of Mother and Father be terminated." Mother and Father both appealed from this decision.

In a December 2018 motion to reconsider filed in the juvenile court, Mother stated that on October 1, after the TPR trial finished but before the court's decision was made, the Department informed all counsel that "[J.T.'s] foster parents have requested her removal from their home." Mother's trial counsel also proffered that Mother had continued to be stable on medication and recently found part-time employment. Recent reports from the Department, as well as letters from mental health professionals treating Mother, also

14

indicate that she has been stable on medication and reliably participating in therapy. In her motion, Mother also objected to her decreased visitation from two hours per week to one hour per month. The motion to reconsider was denied on December 21, and Mother timely appealed both the December 6, 2018 closing order and the December 21, 2018 orders denying her motion for reconsideration.

## DISCUSSION

Mother readily concedes that she suffers from mental illness and that, "in the past, [her] illness made it difficult for her to maintain housing and employment."[6] But she maintains that "she has been compliant with therapy and medication, and mentally stable, for over a year."[7] Mother makes this assertion partly based on alleged facts occurring after the Amended Final Order on November 15, 2018. Because we are limited in our review

---

[6] The parties seriously dispute what should be included in the record for purposes of this appeal. In her opening brief, Mother made references to the transcript of a guardianship review hearing that occurred on February 14, 2019, after the conclusion of the guardianship merits hearing, and Mother included the transcript of that hearing in her appendix. Before oral argument, the Department filed a Motion to Strike this appendix on grounds that the information contained therein is not before this Court and should not be considered. Mother continued to argue based on this post-termination evidence at oral argument but filed no written response to the Department's Motion to Strike. The parties do not dispute that the November 2018 termination order was a final judgment, and Appellants appealed from that order. Mother has no right to introduce new evidence on appeal, and to the extent we might have discretion to allow such new evidence, we decline to exercise it here. To allow that would undermine the finality of a termination proceeding and be an unfair burden on the Department, as well as on the trial and appellate courts. *See* Maryland Rule 8-131. We therefore grant the Department's Motion to Strike and consider only evidence introduced before the November order terminating parental rights.

[7] As earlier indicated, for purposes of our review of the termination order, we do not consider facts occurring after November 15, 2018, the date of the juvenile court's amended final order.

15

to the record from which this appeal was taken, we consider only those facts presented to the juvenile court before the Amended Final Order. *See* Maryland Rule 8-131.

The most recent snapshot of Mother presented to the court by DSS is found in its report to the court covering a period ending May 25, 2018. In its words, "[Mother] has been able to maintain her stability by attending regular therapy and medication management; there have been no psychiatric hospitalizations." It reported that she lives at Dorothy Day Transitional Housing Program, and that her social worker reported that Mother "is motivated to better herself, is currently medication compliant and will be working with DORS to explore part-time work." The testimony at trial revealed that by the time of the merits hearing, Mother had maintained residence at Dorothy Day since April 2018, while saving money to obtain permanent housing, had found employment and maintained it for about seven months, and continued to build a bond with J.T. Nicole Wooden ("Wooden"), a licensed social worker at Dorothy Day, testified that Mother would be able to secure independent housing and part-time employment.[8] Wooden also explained that although Dorothy Day tracks the residents' compliance in taking their prescribed medication, it does not force residents to do so. According to Wooden, Mother was fully compliant. Wooden also testified that Mother is on a waiting list for a program that would allow her to be placed in an apartment and have housing for her daughter. It is uncertain when there would be an opening in this program. Wooden also stated that she "looked at

---

[8] Wooden initially expressed "no doubt" of Mother's ability to meet these goals, but on cross-examination softened this certainty, saying "I believe she can live independently."

16

[Mother's] acuity scale"[9] and determined, "through [their] conversation and through [Mother's] background," that "she would be able to procure housing and part time employment . . . ." Wooden considered that Mother has a bachelor's degree from a college in Cameroon and had worked as an administrative assistant and home healthcare worker.

As a centerpiece of her argument, Mother asserts her fundamental constitutional rights and points out the instability of foster care life. In her words, "Given that [J.T.] has been moved from foster home to foster home without any permanent adoptive placement on the horizon, and that Appellant has fought to maintain a bond with her child, termination of parental rights is not justified or in [J.T.'s] best interests." Mother also maintains that the court's "focus must be on the continued parental relationship, not custody." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 499 (2007). She avers that "even if, as a custody matter, [she] cannot presently provide a home for J.T., that does not require that her legal rights to J.T. be permanently severed." She further draws upon the declaration of the Court of Appeals in *Rashawn H.* that "poverty, of itself, can never justify the termination of parental rights. The fundamental right of parents to raise their children is in no way dependent on their affluence and therefore is not diminished by their lack thereof." *Id.* Mother highlights that she and Father are the only people seeking a permanent relationship with J.T., and, because the foster parents asked that J.T. be removed from their home, J.T. has no permanent relationship to rely on except her parents.

---

[9] An "acuity scale" is a measure the Catholic Charities program uses to determine the "vulnerability" of a client.

17

The Department, responding, reminds us that the court's primary considerations in decisions to terminate parental rights are the health and safety of the child, which are to be considered along with the factors set forth in FL § 5-323(d), and that a reviewing court must be mindful that "[q]uestions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts.'" *In re Yve S.*, 373 Md. 551, 583 (2003) (citation omitted). DSS further maintains that the juvenile court made findings with respect to each of the statutory factors, "which include the provision of reunification services; the results of the parent's efforts to change so that the child can return to the home; the existence and severity of aggravating circumstances; and the child's feelings, adjustment, and well-being." *See also* FL § 5-323(d). It emphasizes that the statute looks to "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Rashawn H.*, 402 Md. at 500.

The Department points out that Mother has been psychiatrically hospitalized several times, that she has experienced auditory hallucinations, and that she attempted suicide in 2014. It asserts that it entered into several service agreements with Mother, and that she had made progress towards reunification by stabilizing her mental health and living situation, but she has been unable, over a two-and-a-half-year period, to "maintain her mental health for more than seven months." It explains that Mother "had maintained her mental health only with the intensive assistance of the medication management services and other supportive services provided through her residential program," and asserts that "there was no evidence that she would be able to maintain her mental health without such services." Given her mental instability, the Department maintains, she is unfit to parent

18

J.T., and the juvenile court did not err or abuse its discretion when it determined that she was unfit.

## Standard of Review

In *In re Adoption of Ta'Niya C.*, 417 Md. 90, 100 (2010), the Court of Appeals laid out the three tenets that guide our review of a juvenile court's decision to terminate parental rights.

> [First,] when the appellate court scrutinizes factual findings, the clearly erroneous standard of Rule 8-131(c) applies. Second, if it appears that the court erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the court founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the court's decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* (cleaned up). *See also In re Yve S.*, 373 Md. 551, 586 (2003) (citation omitted). Yet, notwithstanding our deferential review, "[l]egal conclusions of unfitness and exceptional circumstances are reviewed without deference." *In re Adoption/ Guardianship of C.E.*, 2019 WL 2384797, at *9 (Md. 2019).

## Termination of Mother's Parental Rights to J.T.

We bear in mind the "fundamental liberty interest of natural parents in the care, custody, and management of their child . . . ." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). And "fundamental interests are no less involved in mental-illness-based severances than in others . . . ." *Mary Ellen C. v. Ariz. Dept. of Econ. Sec.*, 971 P.2d 1046, 1053 (Ariz. Ct. App. 1999). Indeed, our Court of Appeals has recently pronounced that

19

"[m]any cases of mental illness can be treated and managed and need not be cause for termination of parental rights." *C.E.*, 2019 WL 2384797, at *16 n.18. In cases involving mental illness, a court should carefully assess whether, at the time of the merits hearing, the parent's efforts to rehabilitate her mental illness "were beginning to bear some fruit . . . ." *Mary Ellen C.*, 971 P.2d at 1054.

Most TPR cases present tragic and complex situations and judges have limited choices in resolving them. This case is no exception. Two features of this case are uncommon. First, the mother suffers from a mental illness—not itself unusual. But Mother's demonstrated insight into her mental illness, her willingness to follow a regimen of medication and therapy, and the success of that regimen, albeit interrupted, is quite rare in a TPR case.[10] In this regard, Mother sharply contrasts with, for example, the mother in *C.E.*, who said: "I don't have a mental illness, I have PTSD from legal abuse syndrome."[11]

---

[10] In *In re Adoption/Guardianship of C.E.*, 2019 WL 2384797, at *2 (Md. 2019), the juvenile court determined the mother to be unfit, and she did not appeal that finding. The pertinent appellate issue involved the DSS's appeal from the trial court's refusal to terminate the parental rights of the father, who, due to his own personality disorder, lacked the capacity to care for C.E. consistently, but had generally positive interactions with C.E. *Id.* at *1. Like the mother, the father in *C.E.* refused to acknowledge the mother's mental illness, and the Court of Appeals held that the father's refusal to sever his relationship with the mother, and his "nearly total reliance" on her for providing childcare while he worked, constituted exceptional circumstances warranting termination, even assuming he was otherwise fit, because he refused to acknowledge the mother's mental health conditions and the adverse effect she had on C.E. *Id.* at *6. Mother's conduct in this case can also be contrasted with the mother in a Nebraska case whose parental rights were terminated because she refused to acknowledge her mental illness, refused to engage in services offered to assist with reunification, and only at the last minute did she make some effort to comply with her goals. *See In re Interest of Alec S.*, 884 N.W.2d 701, 708–09 (Neb. 2016).

[11] C.E.'s mother was diagnosed as having "paranoia, adjustment disorder, major depression, somatization disorder, borderline personality disorder, mania, and bipolar

20

The second unusual feature of this case is that Mother has demonstrated, time and again, J.T. is a priority in her life. Unlike so many TPR cases, nothing in the record reflects that Mother was irresponsible with regard to J.T. or willingly neglected the child. Her consistent and appropriate commitment to her child has only been interrupted by her bouts of depression and anxiety.

Title 5 of the Family Law Article governs guardianship and adoption of children in need of assistance. *See* FL § 5-303(b). As Judge Joseph M. Getty wrote in *C.E.*, 2019 WL 2384797, at *10, "[t]hese express purposes illustrate the inherent tension in any termination of parental rights matter—to provide a child with permanency yet protect the parents from a hasty termination of their rights." Like the juvenile court, the Department has limited choices and limited resources in providing services to assist a parent in being reunited with a child who has been adjudged a CINA. And legislation dictates that a juvenile court must consider the services that DSS has provided to the parent before parental rights are terminated. *See* FL § 5-323(d)(1)(i).

The Maryland Code also sets forth the "unfit or exceptional circumstances" standard a court must apply before it:

> finds by clear and convincing evidence that a parent is unfit to
> remain in a parental relationship with the child or that

---

affective disorder." *C.E.*, 2019 WL 2384797, at *2. Such cluster of mental illnesses "caus[ed] her to lash out against her children," demonstrate "fits of rage," and be unable or unwilling to communicate with the Department. *Id.* The juvenile court found that, "[r]epeatedly, Mother decomposes into stress induced rage behaviors whenever a third party challenges the smallest aspect of her parenting conduct" and that C.E. "can not and should not be subjected to this well established pattern of psychological abuse by Mother." *Id.* at *6.

exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

*Id.* § 5-323(b). The statutory factors a court must consider are extensive and detailed in FL § 5-323(d):

Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:

(1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
(ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and
(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:
(i) the extent to which the parent has maintained regular contact with:
1. the child;
2. the local department to which the child is committed; and
3. if feasible, the child's caregiver;
(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;
(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and

ongoing physical or psychological needs for long periods of time; and

  (iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

  (i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

  (ii) [findings regarding illegal use of controlled dangerous substances];

  (iii) the parent subjected the child to:

    1. chronic abuse;

    2. chronic and life-threatening neglect;

    3. sexual abuse; or

    4. torture;

  (iv) the parent has been convicted, in any state or any court of the United States, of:

    1. a crime of violence against:

      A. a minor offspring of the parent;

      B. the child; or

      C. another parent of the child; or

    2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

  (v) the parent has involuntarily lost parental rights to a sibling of the child; and

  (4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

  (ii) the child's adjustment to:

    1. community;

    2. home;

    3. placement; and

    4. school;

  (iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.[12]

The juvenile court diligently addressed most of these rigorous statutory factors. It did so facing the statutory directive that a decision be issued within 45 days after trial on the merits, FL § 5-319(a)(2),[13] a tight deadline it missed by only a few days. The 45-day post-trial deadline may have played a part in the third, somewhat uncommon, feature of this case: that the judge and both parents were notified by the Department on October 1, 2018—twelve days after the last day of trial, but before the court's decision—that J.T.'s foster parents requested that J.T. be removed from their home. This fact might be unremarkable, except that J.T. had lived with the foster parents for over two years, adoption by the foster parents was anticipated, and the Department, in its presentation to the juvenile court, emphasized repeatedly that the strong bond between J.T. and the foster parents bolstered the case for terminating the parents' rights. Indeed, it introduced testimony that J.T. would be harmed if she were removed from the custody of her foster parents.[14]

---

[12] "If a juvenile court finds that an act or circumstance listed in subsection (d)(3)(iii), (iv), or (v) of this section exists, the juvenile court shall make a specific finding, based on facts in the record, whether return of the child to a parent's custody poses an unacceptable risk to the child's future safety." Md. Code Ann. (2005, 2012 Repl. Vol.), § 5-323(f) of the Family Law Article.

[13] The statutory deadline is not mandatory on the court, and the judge's "paramount consideration is the child's best interest." *In re Adoption of Jayden G.*, 433 Md. 50, 67 (2013).

[14] For example, in an earlier report to the juvenile court, the Department reported: J.T.'s "first strongest attachment is to her foster parents. In consideration of the fifth factor, the potential emotional, developmental, and educational harm to the child if moved from the current placement, there would be harm if [J.T.] was moved from her current caregivers." As earlier indicated, during the merits hearing, the Department offered

The Department offered no information as to the reasons underlying the requested removal of J.T. from her foster parents or about how that sudden change affected her emotionally or her new placement. We consider these inquires crucial because, as Mother asserts, as of October 1, 2018, J.T.'s relationship with Mother, and her limited, video-only relationship with Father, were her only **permanent** attachments. Equally important, it is highly likely that the juvenile court's assessment of J.T.'s best interests was affected by consideration of the apparent stability and safety the former foster family provided.

Finally, and no less important, Mother's mental health was improving—becoming stable—although the record we review only demonstrates that improvement for about six months at the time of the last day of the hearing on September 18, 2018. Both her social worker and psychiatrist opined that the medicines enabled her to remain emotionally stable and avoid the anxiety and major depression, including auditory hallucinations, that had caused her earlier hospitalizations.[15] Neither the Department nor juvenile court should ignore evidence, including expert testimony, about a parent's ability to manage a mental illness with medicine or psychotherapy. *See Matter of Shantelle W.*, 587 N.Y.S.2d 393 (N.Y. App. Div. 1992) (even where one psychiatrist opined that a parent's illness could not be adequately treated, the court reversed a family court termination order on grounds that the expert's diagnosis was based largely on a one-hour interview and directed the social

_____

testimony that J.T.'s "energy and engagement with her foster family indicates that she has a secure and trusting relationship with her current caregivers."

[15] The record suggests that she also improved after receiving electroconvulsive therapy.

services agency to refer the mother for psychiatric therapy and evaluate her recovery progress).

This case is unlike others involving a mental illness that a parent refuses to acknowledge or treat. As we indicated, professionals working with Mother reported that she was insightful about her mental illness and faithful about taking her medications. She also readily reported to medical professionals her history of mental illness. The record reflects that she stopped her medication when she was pregnant with her second child because she was concerned about the risk to her unborn child. She also stopped one medication, Seroquel, because she thought it made her sleepy and wanted to be alert for visits with J.T. A parent's awareness of her illness, and her willingness to seek help to remedy the illness and take steps to protect her children, should be considered as a factor supporting her claim to a continued parental relationship with her child. *See In re D.L.M.*, 31 S.W.3d 64, 68–71 (Mo. Ct. App. 2000) (juvenile court's termination of parental rights of a mother with schizophrenia reversed based on, *inter alia*, the mother's voluntary admission to hospital and good history regarding taking medications, as well as taking steps to ask for help when needed).

Nor does this case involve a parent whose mental illness caused her to be abusive to the child at any time or exhibit any violent behavior towards other people. We do not fully agree with the Department's argument that Mother's "long-standing and poorly managed mental health issues have prompted ten hospitalizations over the course of J.T.'s short life, and there is no indication that she will ever be able to manage her mental health with long-term consistency." We recognize that, of these ten hospitalizations, several

26

occurred within days of each other because Mother was quickly released after initial evaluation and administration of stabilizing medication. Her rapid releases and re-entries may reflect financial considerations by the hospitals, as she was unable to pay for her treatment. If she had been able to stay longer in a mental health hospital, her road to stability may have been less rocky. We also note that most of her severe anxiety and depression after December 31, 2015 occurred while she was pregnant with her first and second children or shortly after their births. At least once, she was diagnosed with postpartum psychosis. Thus, some of her acute episodes of depression and anxiety appear to have been childbirth-related. As to her history before 2015, we have no information about her access to psychiatric care and medications and cannot know how well she managed her mental health. We do know, however, that her recent psychological history of using medicine and therapy shows improvement in her mental stability.

"[D]eficiencies may be temporary and correctable—sufficiently severe to warrant denying custody or visitation at a particular point in time, but with the understanding that the custody or visitation decision is subject to reconsideration upon a showing of changed circumstances." *Rashawn H*., 402 Md. at 498. In considering the best interests of the child, a court should bear in mind the words of *Shurupoff v. Vockroth* that "[m]any of [these] cases reveal a situation in which the child's best interest lies in maintaining the parental relationship but having a third party assume responsibility for the child's immediate and short-term needs." 372 Md. 639, 658 (2003). As the Supreme Court of Missouri recognized: "Parenting is frequently a group effort. Children are often raised with extensive help from grandparents, siblings, extended family, neighbors, day care, baby

27

sitters, a nanny, or an array of public and private service organizations." *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. 2004). Moreover, as an Arizona court articulated: "It is not a parent's burden to prove she will be capable of parenting effectively in the near future, but [the State's] burden to prove there is a substantial likelihood she will not." *Jordan C.*, 219 P.3d at 307.

We also agree with the *Jordan C.* court that "[t]he mere passage of time during which a child is in [foster] care, without more, is not a ground for terminating the parent's rights . . . ." *Id.* at 308. *See also In re Adoption/Guardianship of H.W.*, 460 Md. 201, 234 (2018) (time a father spent incarcerated while his child was in foster care, in itself, did not justify termination of parental rights; for exceptional circumstances to exist, the court must also find that the period of time made continuation of parental relationship detrimental to child's best interests); *In re Adoption/Guardianship of Alonza D.*, 412 Md. 442, 462 (2010) (passage of time parent and child are apart is insufficient in itself to terminate parental rights).

We return to the dilemma faced by the juvenile court when it received notification that the foster home parents who had been described to the court as highly worthy, and strongly bonded with J.T., had simply requested—without any reason disclosed—that J.T. be removed from their home. The court had inadequate information at that point to make a decision; yet, it was facing a statutory deadline to do so. In the Amended Final Order, addressing the statutory criteria of FL § 5-323(d)(4), the court recognized the increasingly positive relationship with Mother during supervised visits, and regarding factors (ii) and (iii), made the following findings:

(ii) the child's adjustment to:

1. [C]ommunity[:]

[J.T.] was part of the community through the foster home where she resided at the time of the trial. She has since been moved to another foster home.

2. [H]ome[:]

[J.T.] had lived with Mr. and Mrs. M since May 26, 2016. On October 1, 2018, the Department informed the Court that Mr. and Mrs. M requested [J.T.'s] removal from their home. The Department located a new pre-adopted placement for [J.T.] and held a Legal Sufficiency Staffing meeting regarding the change of placement on October 3, 2018. Docket No. 158. On October 11, 2018 [J.T.] was placed in a new foster home. Docket no. 159.

3. [P]lacement[:]

[J.T.] was placed in a new foster home after the trial. No supplemental information was provided to the Court on this factor.

4. [S]chool[:]

This factor is not applicable.

(iii) Due to [J.T.'s] age, there is no evidence of her feelings about severance of the relationship with her mother and father.

(iv) [T]he likely impact of terminating parental rights on the child's well-being[:]

The evidence clearly and convincingly indicates that [J.T.'s] well-being will be best-served by terminating [both parents'] parental rights.

In light of J.T.'s unexpected removal from the care of her foster parents, and considering the progress Mother was making in managing her mental illness at the time of

the merits hearing, we conclude that the juvenile court's assessment falls short. It simply failed to adequately take into account the foster parents' unexplained decision to return J.T. to the care of the Department. The juvenile court should have held an additional hearing to reevaluate the best interests of the child after it received notification of the foster parents' decision on October 1, 2018. That inquiry should have included further consideration of whether, after suffering the trauma of being removed from the care of her foster parents, it was still in J.T.'s best interests to also terminate her relationship with Mother—who consistently demonstrated a loving relationship with J.T., even if she was not ready to maintain a home in which she could raise her.

Because the best interest of the child standard must always be harmonized with the fundamental right of parents in the care and custody of their children, *see Rashawn H.*, 402 Md. at 495, the court's inquiry should have considered Mother's progress in her therapy and medical regimen in deciding whether her constitutional rights were impaired by the proposed termination order. We are instructed by *Rashawn H.* that the state may rebut the presumption that a child's interests are best served by maintaining a relationship with a parent "only by showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 498.[16]

---

[16] The Court of Appeals has clearly declared: "[P]overty, of itself, can never justify the termination of parental rights. The fundamental right of parents to raise their children is in no way dependent on their affluence and therefore is not diminished by their lack thereof." *Rashawn H.*, 402 Md. at 499. "Under our Constitutions, the poor and the disabled are no less citizens entitled to the full range of constitutional protections. The Constitutions apply in the social welfare area as in any other area of American life." *In re*

30

Because the juvenile court erred in not holding another hearing—not fully evaluating Mother's mental health progress in light of her fundamental right to parent or J.T.'s best interests in light of the trauma of losing her home with her foster parents—we reverse the order terminating the parental rights of Mother and Father. We remand to the juvenile court to hold a new evidentiary hearing, at which evidence about J.T., Mother, Father, and any other relevant evidence shall be considered, including evidence relating to time periods up until the time of the new evidentiary hearing.

> **ORDER TERMINATING PARENTAL RIGHTS OF MOTHER AND FATHER REVERSED. CASE REMANDED TO CIRCUIT COURT OF MONTGOMERY COUNTY FOR NEW EVIDENTIARY HEARING CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

*Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 669 (2002) (internal citations omitted). Clearly, Mother's poverty played a role in this termination decision because of her dependence on subsidized programs.

31