*In Re K.H., J.H., & D.H.*, No. 193, September Term, 2021. Opinion by Ripken, J.

**JUDGES – BIAS, RECUSAL, AND DISQUALIFICATION – PRESUMPTION OF IMPARTIALITY**

There is a strong presumption that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified.

**JUDGES – BIAS, RECUSAL, AND DISQUALIFICATION – IN GENERAL**

The party requesting recusal has a heavy burden to overcome the presumption of impartiality and must prove the judge has a personal bias or prejudice against him or her or has personal knowledge of disputed evidentiary facts concerning the proceedings. Only bias, prejudice, or knowledge derived from an extrajudicial source is personal bias as it relates to recusal. Where knowledge is acquired in a judicial setting, or an opinion is formed on the basis of evidence presented in the judicial proceedings, neither that knowledge nor that opinion qualifies as personal bias.

**FAMILY LAW – DISPOSITION PROCEEDINGS – NATURE AND SCOPE OF DISPOSITION**

Circuit court did not err in refusing to consider placement of children with maternal aunt at TPR hearing, where the potential suitability of maternal aunt as placement was addressed in the CINA case and the court found placement not to be in children's best interests. The appropriate focus of the TPR hearing was the fitness of the child's mother as a parent.

Circuit Court for Montgomery County
Case Nos. 06-Z-20-11, 06-Z-20-12, & 06-Z-20-13

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 193

September Term, 2021

_____

IN RE: K.H., J.H., & D.H.

_____

Kehoe,
Berger,
Ripken,

JJ.

_____

Opinion by Ripken, J.

_____

Filed: November 18, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant Y.H.L.[1] ("Mother") appeals from an order of the Circuit Court for Montgomery County, sitting as a juvenile court, which granted the petition of the Montgomery County Department of Health and Human Services ("the Department") for guardianship with the right to consent to the adoption of Mother's natural children, K.H.,[2] (born 3/14), J.H. (born 3/16), and D.H. (born 1/18), and terminated Mother's parental rights. According to Mother, the court erred in denying her motion for recusal and in terminating her parental rights. For the reasons that follow, we shall affirm the order of the juvenile court.

### FACTUAL AND PROCEDURAL BACKGROUND

In March 2018, E.H.,[3] the older maternal half-sister of K.H., J.H., and D.H., disclosed neglect and physical and sexual abuse by Mother and maternal grandmother ("Grandmother"), some of which was witnessed by Father, who did not intervene. E.H. was removed from Mother and Father's care and adjudicated CINA[4] in April 2018, after

---

[1] To protect the identity of the children, we will use initials throughout this Opinion to refer to all parties.

[2] K.H. prefers to use her middle name and is often referred to as S. in record documents.

[3] E.H. is repeatedly (but erroneously) referred to as A.H. in the hearing transcripts.

[4] A CINA is a "child who requires court intervention because: (1) the child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) the child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code, Courts and Judicial Proceedings Article ("CJP") § 3-801(f) (2020 Repl. Vol.).

which the Department began working with the younger H. children.[5]

Mother was arrested on charges of child abuse and neglect, and Father was arrested on charges of sexual abuse, child pornography, and failing to protect E.H. from Mother's abuse. Mother and Father were also detained by U.S. Immigration and Customs Enforcement ("ICE").[6] Because neither parent was available to care for the children, the Department placed the H. children in foster care and filed a CINA petition.

In June 2018, E.H. disclosed to a social worker that Mother had abused K.H.— forcing her to eat by rubbing salsa or jalapenos on her arms and mouth, hitting her with a

---

[5] Mother and Father are also the natural parents of two other daughters, G.O. and Y.O. Those children are in foster care and are not involved in this appeal.

[6] Mother and Father are citizens of El Salvador. Following Mother's arrest, she was held without bond until she was transferred to ICE custody. Father was released on bond with the condition that he have no contact with the children, until he was subsequently detained by ICE.

Father was ultimately acquitted of the charged crimes. However, he had an indicated finding—meaning there exists "credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur," Md. Code, Family Law Article ("FL") § 5-701(m) (2019 Repl. Vol.)—of sexual abuse with Child Welfare Services, for which the appeal period had expired.

Mother was convicted of sexual abuse of a minor and second-degree child abuse and sentenced to a total of twenty-five years in prison, with all but ten years suspended. This Court reversed her convictions on a procedural ground and remanded the matter to the circuit court for a new trial. *See* [*Y.H.L.*] *v. State*, No. 1167, September Term 2019 (filed July 30, 2020). Mother subsequently pleaded guilty and was sentenced to a total of twenty years in prison, a portion of which was suspended; she was released after receiving credit for time served and placed on supervised probation. She was arrested on new charges in May 2021, with trial scheduled for December 2021 at the time of this Opinion, last checked October 2021. As a result of the new charges, Mother was also charged with violating probation and is again incarcerated.

stick, and pushing against her eyeballs. E.H. said that Mother also force-fed medication to K.H. and slapped the child if she regurgitated the medication.

The juvenile court adjudicated the children CINA and instituted a permanency plan of reunification. The court placed the H. children with their maternal aunt, S.C., who had traveled with two of her own children from California to care for the H. children in the family home, and a family friend who lived in Maryland. In November 2018, S.C. announced her intention to return to California following what she perceived to be overly intrusive interference by the Department. S.C. nonetheless expressed a desire to obtain custody and move the children to California. The juvenile court determined that custody with S.C. was not then a viable option and placed the children in foster care, where they have remained.[7]

In November 2019, the juvenile court declined Mother's request for an Interstate Compact for the Placement of Children ("ICPC") investigation to approve placement of the children with S.C. in California.[8] The court also suggested that the Department consider a change in permanency plan away from reunification.

In February 2020, the Department recommended that the juvenile court change the children's permanency plan to adoption by a non-relative, and the children's attorney

---

[7] J.H. and D.H. have been in the same home with foster mother A.T. since November 2018. K.H. joined them in that home in June 2020. A.T. has offered herself as an adoptive resource for all three children.

[8] Codified in FL §§ 5-601 to 611, the ICPC provides the rules on relocating a child in the foster care system from one state to another.

3

agreed. According to the Department, it did not consider S.C. as a placement resource because the Code of Maryland Regulations ("COMAR") excludes individuals from being considered under the ICPC if they are not U.S. citizens or do not have a green card, and S.C., an undocumented immigrant, did not qualify. The Department was also concerned that S.C. could not care adequately for all the H. children, along with her own two minor children. The juvenile court adopted the Department's recommendation that the permanency plan for K.H., J.H., and D.H. change to adoption by a non-relative.[9]

On July 8, 2020, the Department filed a petition for guardianship with the right to consent to adoption or another permanent living arrangement in relation to K.H., J.H., and D.H., alleging that guardianship would be in the best interest of the children, who had been out of Mother and Father's care and custody since May 2018. The Department asserted that:

> The conditions which led to the separation still persist, and similar conditions of a potentially harmful nature continue to exist. There is little likelihood that those conditions will be remedied at an early date so that the child[ren] can be returned to the biological parents in the immediate future and the continuation of the relationship between the biological parents and the child[ren] greatly diminishes the child[ren]'s prospects for early integration into a stable and permanent family.

The attorney for the children consented to the petition "upon the condition that the Respondent's current foster parent, A[.]T., is the adoptive resource." Father objected to the petition. Mother also objected, stating that the "family relationship is worth pursuing" and that maintaining that relationship was in the best interest of the children.

---

[9] The court also changed the permanency plan for G.O. and Y.O. to custody and guardianship by a non-relative.

4

At a December 29, 2020 CINA review hearing, Mother opposed the permanency plan of adoption and expressed a continued desire to have the children placed with S.C. in California. The juvenile court stated it would need "more information about whether the family member in California is viable." The court further expressed concern over moving the children across the country because it would be another major disturbance to their lives.

The Department responded that, given the number of moves K.H. had already endured and the length of time D.H. and J.H. had been in their foster home with A.T., "it's unlikely that we will recommend removing these children from this placement." The children's attorney agreed that moving the children from their placement with A.T. would be "quite detrimental." The juvenile court ruled that it would be in the children's best interest to reaffirm the plan of adoption by a non-relative.

At a hearing on February 26, 2021, Father consented to the termination of his parental rights relating to K.H., J.H., and D.H. His consent was conditional upon them being adopted by A.T. Mother continued to object to termination of her parental rights.

The juvenile court held a contested guardianship/termination of parental rights ("TPR") hearing on March 1–3, 2021. Therein, Mother objected to TPR in favor of adoption by a non-relative. According to Mother, placement with her sister S.C., who had passed a home study in California, would permit the children to maintain a connection with their extended family.

K.H.'s therapist, Julia Wessel, who was accepted by the court as an expert in social work, testified that K.H. had been referred to her for concerns about "processing [K.H.'s] trauma" after "reenacting some traumatic memories" and K.H. stating that "her heart hurt"

from missing her parents and siblings.[10] Ms. Wessel initially diagnosed K.H. with an adjustment disorder with mixed disturbance of emotion and conduct, as a victim of neglect and suspected physical abuse. Ms. Wessel later changed the diagnosis to the "more serious" unspecified anxiety disorder, as K.H.'s anxiety was found to drive most of her symptoms.

By December 2020, Ms. Wessel had observed that K.H. appeared sadder and more anxious—struggling to manage when she did not get help from her caregivers right away—and suffering from sleep issues and nightmares. Ms. Wessel opined that the lack of permanency had negatively impacted K.H.'s mental health.

Ms. Wessel found that, more recently, K.H. had become increasingly comfortable with A.T. and went to A.T. for support and reassurance. In Ms. Wessel's view, K.H. was developing a secure attachment to A.T., who appropriately addressed K.H.'s emotional, educational, and therapeutic needs and had created a safe and stable environment for the child. According to Ms. Wessel, without a caregiver who validated K.H. and believed she and her siblings had been abused, K.H.'s improvement in therapy would be hindered; A.T. provided that validation.

Tanya Kulprasertrat, the Department social worker assigned to the H. children, also accepted by the court as an expert in social work, testified that in her expert opinion, the children could not be safe in Mother's care given the severity of the physical and sexual abuse that the children, and especially K.H., had been found to suffer in Mother's home. Moreover, Mother's criminal case had not yet been resolved, and she remained

---

[10] Ms. Wessel later explained that a child can grieve a loss even if the loss is from an unhealthy attachment.

incarcerated for an indeterminate amount of time, which hindered her participation in services the Department could offer.[11]

In Ms. Kulprasertrat's opinion, K.H. and J.H. had "some attachment to their mother," but D.H., removed from Mother's care at four months of age, had none.[12] Additionally, although Mother sent approximately twenty-five to thirty letters and drawings to the children during the pendency of the case, K.H. is the only one of the three children who listened and stayed engaged as Ms. Kulprasertrat read the letters. The children were, however, strongly bonded to each other and to their older sisters.

Ms. Kulprasertrat explained that an ICPC investigation had in fact been completed and approved placement of the children with S.C. in California, but she nonetheless did not believe the children would be safe with S.C., as they have "a very minimal attachment to their aunt" and do not interact much with her during their monthly video calls, instead crying or talking strangely to the camera. In addition, Ms. Kulprasertrat noted that S.C. had never asserted that she believed E.H.'s disclosures of Mother's abuse and that lack of validation of the children's feelings and memories would undermine their wellbeing.

Ms. Kulprasertrat also testified that placement with S.C. would require a cross-country move to a state with which the children are not familiar, when they are well adjusted to their current placement. The anxiety of another move, especially to K.H., would

---

[11] The Department wanted Mother to undergo a psychological evaluation before initiating other services but had been unable to locate a Spanish-speaking provider who would travel to the jail amid COVID-19 pandemic restrictions to conduct the evaluation.

[12] The court had not permitted Mother visitation with the children since they were removed from her care in 2018, and they had not seen her since that time.

7

be very difficult. The Department also had safety concerns about S.C. caring for all the children, including her own, in a small home with only one income.[13]

Ms. Kulprasertrat stated that J.H. and D.H. are happy and excited to be with A.T., and they refer to her as "Mommy." In Ms. Kulprasertrat's view, J.H. and D.H. would be negatively impacted if removed from A.T.'s care because they had lived with her for over two years and developed a "a very strong attachment" to her and her extended family.

Ms. Kulprasertrat also opined that K.H., who had adjusted well and began to bond with A.T., would be at risk of traumatic harm if removed from A.T.'s care. K.H. had already been through several placement transitions, and each one negatively impacted her mental health because she was never sure if her living arrangement was permanent. Ms. Kulprasertrat testified that even K.H. moving to live with S.C., a relative with whom she had been placed previously, would be difficult because it would be another jarring transition. Therefore, the Department supported the termination of Mother's parental rights, as it would give the children "the stability and permanency that they deserve," especially because Mother had made no progress toward alleviating the issues that caused

---

[13] During the hearing, Ms. Kulprasertrat received the full written ICPC report approving S.C. as a placement resource. After reviewing it, Ms. Kulprasertrat nonetheless maintained her position that the children would not be safe with S.C.

If granted custody of the children, the report detailed that S.C. planned to quit her job, which provided more than 50% of the C. family's income. The Department was therefore concerned that the H. children would not properly be provided for with the reduced family income. In addition, S.C.'s plan called for the three H. children to live in one bedroom with her biological son, which would be a "really crowded space." Ms. Kulprasertrat believed it was inappropriate for K.H. to share a room with three boys, particularly as she approached adolescence.

8

the children to be removed from her care three years earlier.

A.T. testified that when K.H. came to live with her, the transition was initially difficult, given that K.H. had already been in several placements. Diagnosed with anxiety, K.H. cried most nights for the first month, but her bond with A.T. was "growing every day." A.T. further testified that if she were to adopt the three children, who were "very close," she would keep them bonded with their older siblings and aunt S.C.

A.T. acknowledged that the children receive letters from Mother and that they like to hear what those letters say and pin the letters to bulletin boards in their rooms. J.H. and D.H. had never asked to respond to Mother. While K.H. had expressed an occasional desire to write back, she never pursued doing so.

S.C. testified that when she came to Maryland to care for her sister's children, she "did everything. . . [w]hatever they asked of me," including caring for them in the home and taking them to school, doctors' appointments, and therapy. S.C. said she returned to California in November 2018 because her family support system was there. She claimed that the Department told her that to care for the children, she would have to "stay in Maryland for life," despite her request to transfer the case to Los Angeles.

At the suggestion of the California counterpart to the Department, S.C. said she had taken parenting classes, undergone a background check, and purchased beds for the children. She testified that if the children were placed with her, she and her husband intended to purchase a larger home with more bedrooms.

When asked if she believed that her sister and her mother had abused E.H. or K.H., S.C. responded, "I cannot tell you for certain yes or no because I didn't get to see anything.

9

I was living in Los Angeles. To be truthful, I cannot tell you what's the truth or not." She stated that if she were told she must accept that her mother and sister had abused E.H. and K.H. to be permitted to care for the children, she indicated she would be willing to do so.

When called as a witness by the Department, Mother invoked her Fifth Amendment right against self-incrimination when asked if she had applied hot sauce or jalapeno peppers to her children's mouths, faces, arms, or genitalia as punishment. Her response was the same when asked if she had hit her children with her hand or other objects, pulled their hair, or held a knife to their bodies.

In closing, the Department asserted that the overwhelming evidence proved that the children could not be safe in Mother's care in large part due to her continued incarceration. In addition, the Department argued that the incredibly serious abuse that underlies this case rendered Mother unfit to remain in a parental relationship with the children and made reunification "difficult, if not impossible." The Department also argued that, based on the evidence presented, the children should not be placed with their aunt in California. Therefore, the Department concluded, it was in the best interest of the children for the juvenile court to terminate Mother's parental rights so the children could be adopted and find the permanency and stability they deserved. The attorney for the children agreed with the Department's recommendations.

Mother argued that the Department had implicitly found her fit to maintain a parental relationship by recommending that the children's permanency plan remain reunification until February 2020. In addition, the children had family willing and able to care for them. Therefore, Mother concluded, the children's best interest would be served

by a continued parental relationship with her and a gradual transition toward placement with S.C.

The juvenile court held the matter *sub curia*, entering its written final order of guardianship on March 31, 2021. In its findings of fact and conclusions of law, the court discussed the procedural history of the case and considered the required statutory elements. It then found, by clear and convincing evidence, that it was in the best interest of the children to terminate Mother's parental rights and grant the Department guardianship with the right to consent to adoption or long-term care short of adoption:

> It is undoubtedly in the children's best interests to terminate Mother's parental rights. The children and their older sisters survived chronic physical and sexual abuse. When the children entered care, Mother was ordered to participate in a psychological exam, which Mother failed to do. The extent of Mother's participation in services is her twenty-five to thirty letters to the children over almost three years. Mother has not made consistent efforts to improve her circumstances, despite opportunities to do so. It is in the children's best interest to achieve permanency in a safe home.

> \* \* \*

> Happily, the children have done remarkably well in [A.T.'s] home. They have frequent contact with E.[H.], G.[O.], and Y.[O.], which [A.T.] promised would continue. She is committed to ensuring the children have all the support they need, including therapy and tutoring for K.[H.] [A.T.] testified that J.[H.] and D.[H.] call her "Mommy" and that K.[H.]'s bond with her is growing. Given how well the children are doing and how [A.T.] has continued to support them, it is in the children's best interest to remain in [A.T.'s] home.

> The Court has made findings of fact pursuant to the statutory factors found in [FL] § 5-323(d). The Court has weighed the evidence in its entirety, including the credibility of the witnesses before it. Taking all of the above into consideration, the Court finds by clear and convincing evidence that Mother and Father are unfit, that Mother and Father pose an unacceptable risk to the children's future safety, and that it is in the children's best interest that the parental rights of [Mother] and [Father] be terminated.

11

The court granted A.T. limited guardianship of the children for decision-making purposes on April 20, 2021. Mother noted a timely appeal of the court's order. Additional facts will be included as they become relevant to the issues.

## ISSUES PRESENTED

In her appeal, Mother asks us to consider the following questions:[14]

I.  Did the trial court err in denying Mother's motion for recusal?

II.  Did the trial court err in terminating Mother's parental rights?

For the reasons explained below, we discern no error by the trial court in denying the motion for recusal or in terminating Mother's parental rights.

## DISCUSSION

**I.  THE COURT DID NOT ERR IN DENYING MOTHER'S MOTION FOR RECUSAL.**

Mother's first contention of error is that the trial court erred in denying her Motion for Recusal based on the judge's partiality. According to Mother, the judge's affirmation of Father's consent to adoption demonstrated the judge's view that adoption was the right choice for the children. In Mother's view, said affirmation indicated that termination of Mother's parental rights was "inevitable." The Department responds that the trial judge appropriately denied Mother's motion. We first provide additional background, then discuss the standard of review, and ultimately reach the parties' legal arguments.

---

[14] Father consented to the termination of his parental rights and is not a party to this appeal.

12

## A.    Background

Following Father's affirmation of his written consent to the termination of his parental rights at the February 26, 2021 hearing, the juvenile court expressed its satisfaction with Father's decision that the children's best interest lay in adoption by A.T. The court then addressed Father directly:

> THE COURT:  So, [Father] I just want to say I understand this is difficult for you but it's I think the right thing for you to do for the children. And that in that way you are demonstrating your love and care for them. And I hope things will go more smoothly for you than they have in the past. And with that unless someone needs me to say something else I think we can close.

At the start of the TPR hearing on March 1, 2021, Mother's attorney requested that the judge recuse herself from the remainder of the proceedings:

> MS. LONG: Thank you, Your Honor. Preliminarily, I would like to renew my recusal motion based on statements that Your Honor made at the acceptance of [] [F]ather's agreement on Friday, February 26th.[15] I am concerned that Your Honor expressed that you have, that you felt that it was in the best interest of the children for him to have done so and I think that that is surely at the heart of what we're doing in this case. And if Your Honor has already made up her mind it is not appropriate to have Your Honor preside over the trial.
>
> THE COURT: Yes, and that was for [F]ather, Ms. Long, and [M]other is today, and tomorrow, and the next day; and I have no reason at all to recuse myself because of what I said to [F]ather. They're two different people. So, I don't intend to recuse myself.

---

[15] Mother had previously moved for the judge's recusal on the ground that the judge, who had found it to be in the best interest of the children to change their permanency plan to adoption by a non-relative, should not preside over the TPR determination, as the court making that decision "should be unencumbered by findings of the CINA court, where rules of evidence are often lax, the standard of proof is lower, and the stakes are not of the same Constitutional weight." The juvenile court denied the motion.

## B.      Standard of Review

Judges "occupy a distinguished and decisive position . . . [requiring them] to maintain high standards of conduct." *Jefferson-El v. State*, 330 Md. 99, 106 (1993). "[A] judge must disqualify 'himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned[.]'" *Conner v. State*, 472 Md. 722, 737 (2021) (quoting Maryland Rule 18-102.11(a)(1)). "[T]here is a strong presumption . . . that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Jefferson-El*, 330 Md. at 107. "Consequently, 'the decision to recuse oneself ordinarily is discretionary and will not be overturned except for abuse.'" *Conner*, 472 Md. at 738 (quoting *Attorney Grievance Comm'n v. Shaw*, 363 Md. 1, 11 (2001)).

## C.      Motion for Recusal

On appeal, Mother contends that the juvenile court erred in denying her motion for recusal because, in her view, the judge did not maintain the appearance of impartiality when commenting that Father was doing the right thing for his children by consenting to the termination of his parental rights. A clear inference from the judge's comments, Mother concludes, is that the termination of Mother's rights—a decision still pending when the court accepted Father's consent—was all but inevitable.

"Generally speaking, a judge is required to recuse himself or herself from a proceeding when a reasonable person with knowledge and understanding of all the relevant facts would question the judge's impartiality." *Matter of Russell*, 464 Md. 390, 402–03 (2019). Maryland Rule 18-102.11(a)(1) enumerates instances where a judge's impartiality

14

might reasonably be questioned, including where the judge "has a personal bias or prejudice concerning a party[.]" "The party requesting recusal has a heavy burden to overcome the presumption of impartiality[.]" *Shaw*, 363 Md. at 11. As *Jefferson-El* makes clear:

> To overcome the presumption of impartiality, the party requesting recusal must prove that the trial judge has a personal bias or prejudice concerning him or personal knowledge of disputed evidentiary facts concerning the proceedings. Only bias, prejudice, or knowledge derived from an extrajudicial source is 'personal.' Where knowledge is acquired in a judicial setting, or an opinion arguably expressing bias is formed on the basis of information acquired from evidence presented in the course of judicial proceedings before him, neither that knowledge nor that opinion qualifies as 'personal.'

330 Md. at 107 (citations and some internal quotation marks omitted).

Mother did not make any showing of "personal bias or prejudice," as those terms are defined in *Jefferson-El*. The judge's comments after Father's affirmation of his decision to consent to the termination of his parental rights were addressed solely to Father relating to his decision, which was of a posture entirely separate from Mother's. The judge made no mention of Mother in her comments to Father and later noted that Mother and Father are "two different people."

By pointing out that Mother's position would be presented during the upcoming three-day contested TPR hearing, the judge also implicitly denied Mother's accusation that she had already determined how she would rule in Mother's case. During her TPR hearing, Mother was given the opportunity to cross-examine the Department's and the children's witnesses and present her own evidence as to why the termination of her parental rights would not be in the best interest of the children. There is no indication in the hearing

15

transcripts that the juvenile court was predisposed to a decision as it related to Mother or was likely to ignore relevant evidence presented at the lengthy hearing. To the contrary, the record, including the court's written order of guardianship, indicates that the court carefully considered all the evidence and made its decision based solely on the evidence as it pertained to Mother.

Finally, there is nothing in the record to suggest that any knowledge regarding this matter on the part of the judge was acquired through any avenue other than the judicial proceedings in the matter, over which the judge had presided for approximately three years. We are not persuaded that Mother overcame the strong presumption of impartiality on the part of the juvenile court. Accordingly, we hold that Mother has failed to demonstrate that the juvenile court judge abused her discretion when she declined to recuse herself from the TPR hearing.

## II.     THE COURT DID NOT ERR IN TERMINATING MOTHER'S PARENTAL RIGHTS.

Mother also avers that the juvenile court erred in terminating her parental rights. She claims that the court's error is two-fold: first, the court erred in rejecting the ICPC approval of placement of the children with S.C. in California, and second, the court made findings of fact that were clearly erroneous.

Termination of parental rights decisions are reviewed under three interrelated standards: clear error review for factual findings, *de novo* review for legal conclusions, and abuse of discretion for the juvenile court's ultimate decision. *In re Adoption/Guardianship of C.A. & D.A.*, 234 Md. App. 30, 45 (2017). In other words, "when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles

16

and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion." *Davis v. Davis*, 280 Md. 119, 126 (1977). And, "[w]here the best interest of the child is of primary importance, 'the trial court's determination is accorded great deference, unless it is arbitrary or clearly wrong.'" *In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A in the Circuit Court for Allegany County*, 100 Md. App. 262, 270 (1994) (quoting *Scott v. Dep't of Soc. Servs.*, 76 Md. App. 357, 382–83 (1988)).

Mother's first argument must fail because the suitability of other placements was not the focus of the TPR hearing. To be sure, the juvenile court made the decision not to approve placement of the children with S.C. during the CINA proceeding, and this Court affirmed that decision on appeal. Decisions relating to the children's placement are not appropriate during a TPR determination, when the appropriate inquiry is whether the parent has the ability "to care for the child[ren] in a way that does not endanger the child[ren]'s welfare." *In re Adoption/Guardianship of C.E.*, 464 Md. 26, 52 (2019); s*ee also In re Adoption/Guardianship of Cross H.*, 200 Md. App. 142, 152 (2011) (explaining that "the circuit court was correct in noting that the appropriate focus of the TPR hearing was not the potential suitability of the paternal grandmother as a placement for [the child]—as this was an issue properly addressed in the CINA case—but rather, the fitness of [Mother and Father] as parents").

Even so, the juvenile court considered Mother's argument that the children be placed with S.C. in California after the Department received the written ICPC investigative report approving S.C. as a placement resource. Despite the ICPC approval, the court found

that placement of the children with S.C. would not be in the children's best interest. The court made such a finding based on concerns about the size of S.C.'s home; her family's income; her continued failure to express belief that her sister and mother abused the H. children; her minimal bonds with the children; her language barrier with the children; and the tremendous upheaval a cross-country move would cause the children, who were securely attached to A.T. and to their siblings and in a stable placement. In addition, the court noted that Maryland cannot provide funding for undocumented individuals and that moving the H. children to California would "once again split up the children and their older sisters. G.[O.] and E.[H.] would be left in Maryland, without their siblings, which is an unviable option." To the extent relevant to the TPR proceeding, we cannot say the juvenile court abused its discretion in agreeing with the Department's recommendation and declining to place the children with S.C.

Turning to Mother's second contention that the juvenile court erred in terminating her parental rights because its fact-finding was clearly erroneous, we are similarly unpersuaded. When a local department determines "that a parent cannot adequately care for a child, and efforts to reunify the parent and child have failed, the State may intercede and petition for guardianship of the child[.]" *In re Adoption/Guardianship of C.E.*, 464 Md. at 48. The grant of a petition for guardianship "terminates the existing parental relationship" and transfers the parental rights to the State, so that the State may "re-transfer the parental rights to an adoptive family." *Id.*

In deciding whether parental rights should be terminated, the juvenile court's overriding consideration is the best interest of the child. *See In re Adoption of Ta'Niya C.*,

18

417 Md. 90, 112 (2010). The law presumes that a child's best interests are served by maintaining a parental relationship between the child and the child's parents, but the Department may overcome this presumption if it establishes, by clear and convincing evidence, that the parent is unfit or that exceptional circumstances exist that would make continuing the parental relationship detrimental to the child's best interests. *In re Adoption/Guardianship of C.E.*, 464 Md. at 50.

The statutory authority for a juvenile court to terminate parental rights over the objection of a natural parent is found in FL § 5-323(b), which states:

> If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

FL § 5-323(d) provides that, "in ruling on a petition for guardianship of a child," the juvenile court "shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests[.]" FL § 5-323(d)(1)–(4) sets forth the factors that the court "must specifically examine and consider" when making its determination.[16] *In re*

---

[16] The FL § 5-323(d)(1)–(4) factors:

> (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
> (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

\* \* \*

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

*Adoption/Guardianship of C.E.*, 464 Md. at 53. These factors also guide the assessment of whether a parent is unfit or whether exceptional circumstances exist justifying the termination of parental rights. *Id.* at 50–51.

"Ultimately, these factors seek to assist the juvenile court in determining 'whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare.'" *Id.* at 51–52 (quoting *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 500 (2007)). The statute "does not require a trial court to weigh any one statutory factor above all others. Rather, the court must review all relevant factors and consider them together." *In re Adoption/Guardianship No. 94339058/CAD in Circuit Court for Baltimore City*, 120 Md. App. 88, 105 (1998).

Here, Mother challenges the juvenile court's findings, pursuant to FL § 5-323(d)(2), that: (1) she was at fault for failing to complete the psychological evaluation required by the Department; and (2) she did not make other consistent efforts to improve her circumstances. In addition, she argues that the court "denigrated" her efforts to maintain

---

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;
  (ii) the child's adjustment to:
   1. community;
   2. home;
   3. placement; and
   4. school;
  (iii) the child's feelings about severance of the parent-child relationship; and
  (iv) the likely impact of terminating parental rights on the child's well-being.

contact with the children through letters. She also avers that the juvenile court clearly erred in finding, pursuant to FL § 5-323(d)(4)(i), that the children were not emotionally bonded to her. We will consider each contention in turn.

Subsection (d)(2) of FL § 5-323 assesses "the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home[.]" Ms. Kulprasertrat testified that Mother had not completed a psychological evaluation, despite having been ordered by the court to do so. Ms. Kulprasertrat explained that Mother initially declined to undergo a psychological evaluation because it might affect the outcome in her then-pending criminal case and that once Mother became willing to submit to the evaluation in 2020, the situation was complicated by her incarceration and the restrictions imposed during the COVID-19 pandemic. The psychological evaluation required a Spanish-speaking psychologist who would be willing to conduct the evaluation in the jail during the pandemic. Despite numerous efforts, including contacting five individual providers and governmental agencies and inquiring if the jail partnered with any providers who perform on-site evaluations, Ms. Kulprasertrat was unable to locate such a person.

Although Mother is not at fault for the lack of a psychological evaluation during the pandemic, the fact remains that it did not occur, notwithstanding the best efforts of the Department.[17] The juvenile court did not clearly err in finding that the evaluation, as a

---

[17] The Court of Appeals has explained that "'reunification efforts must be judged within the context of the resources available to the agency, with the agency receiving the benefit of the doubt when resources are limited.'" *In re Shirley B.*, 419 Md. 1, 27 (2011) (quoting

threshold service, was required before the Department could determine "what services would aid reunification" and Mother "never had a psychological evaluation."

Mother relatedly claims that the juvenile court erred in finding she had not made efforts to improve her circumstances, despite opportunities to do so. Mother points to Ms. Kulprasertrat's testimony that: (1) the Department had not recommended other services for her because the psychological evaluation, which would have addressed her cognitive functioning and pointed to appropriate additional services, had not occurred; and (2) Ms. Kulprasertrat had not discussed with Mother services in which she could engage while in jail. But, as the juvenile court pointed out in its written findings of fact and conclusions of law, "while it is [] true that no services were provided, Mother did not participate in parenting classes or services that would help rehabilitate her." The court also noted that Mother initiated contact with the Department only twice in the three years the case had been open, leading to an inference that she made limited effort proactively to seek ways in which she could reach her goal of reunification with the children. The court's finding that Mother made no other efforts to improve her circumstances is not clearly erroneous.

The juvenile court also found that Mother's efforts to maintain regular contact with the children consisted of letters to the children. Contrary to Mother's claim, the court did not denigrate that effort. In its findings of fact, the court merely referred to the evidence presented during the hearing, stating, "Mother sent twenty-five or thirty letters to the

---

Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. TOL. L. REV. 321, 365 (2005)). Accordingly, "a juvenile court must be cognizant of the availability of services when determining whether the Department's efforts have been reasonable." *Id.*

children. Letters displayed during the trial were appropriate. . . Mother has sent letters to the children, but due to her incarceration, that has been the extent of her contact with them." And, in its conclusions of law, the court reiterated: "The extent of Mother's participation in services is her twenty-five to thirty letters to the children over almost three years." Based on the evidence presented at the TPR hearing, there is no clear error in this factual finding.

Finally, the court did not clearly err in its consideration of the emotional ties the children shared with Mother and their siblings, pursuant to FL § 5-323(d)(4)(i). The court found that the children were "very bonded" with their older sisters, and Mother does not dispute that finding. Mother disagrees with the court's findings that J.H. and D.H. are "not bonded to Mother" and "likely do not have any feelings about the severance of their relationship with Mother" and that terminating Mother's parental rights "will ultimately benefit K.[H.]'s mental health."

The juvenile court had before it evidence that J.H. and D.H. were placed with A.T. in November 2018, when they were two-and-a-half years old and ten months old, respectively, and they have not seen Mother since that time. The only tie that J.H. and D.H. maintain with Mother is through her letters, but Ms. Kulprasertrat stated that they do not sit still to listen when she reads the letters to them, and they have never asked to respond. On the other hand, they are well-bonded with A.T., whom they view as their "Mommy," and her extended family. Based on the evidence presented, the court properly could have inferred that J.H. and D.H. have no emotional bond with Mother.

K.H., four years old when removed from Mother's care, remembers living with Mother and has a greater bond with Mother than do J.H. and D.H. Competent evidence

24

also indicates that K.H., who has suffered mental health issues as a result of her numerous foster care transitions, is bonding with A.T. and does not want to move from A.T.'s home. Although K.H. listens with interest to Mother's letters, and asks to respond on some occasions, she quickly loses interest in doing so. The bond that K.H. maintains with Mother does not mitigate the much stronger bonds she maintains with A.T. and her brothers, or the severe neglect and physical abuse she suffered at Mother's hand, which Mother does not dispute.

Nothing in the record or in the juvenile court's guardianship order demonstrates that the court clearly erred in its factual findings or abused its discretion in terminating Mother's parental rights. Mother's abuse and neglect of the H. children, her failure to complete the required psychological evaluation as a threshold to other services, and her limited bonds with the children provide clear and convincing evidence that justifies the juvenile court's finding that Mother is unfit or that there are exceptional circumstances that would make her continued parental relationship detrimental to the children's best interest. The court carefully reviewed the facts, considered all the required factors set forth in FL § 5-323(d), applied the facts to each criterion, and made an appropriate decision based on its analysis. We discern no abuse of discretion in the court's conclusion that it is in the children's best interest to terminate Mother's parental rights and grant guardianship to the Department.

**ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS A JUVENILE COURT, AFFIRMED. COSTS TO BE PAID BY APPELLANT**.

25